Geneva EIDSON, Plaintiff/Appellant,

v.

REPRODUCTIVE HEALTH SERVICES, Defendant/Respondent.

No. 60410.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 21, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 27, 1993.

Application to Transfer Denied
Jan. 25, 1994.

Frank J. Niesen, Jr., St. Louis, for plaintiff/appellant.

Frank Susman, Susman, Schermer, Rimmel & Shifrin, Clayton, for defendant/respondent.

CRANE, Judge.

Plaintiff, Geneva Eidson, appeals a judgment on a jury verdict in favor of defendant, Reproductive Health Services, on her medical malpractice action arising from her daughter's suicide. She claims error in two jury instructions and in the dismissal of her claim for statutory negligence. We find one of the jury instructions was erroneous. However, we affirm because plaintiff failed to make a submissible case. Further, the trial court properly dismissed the statutory negligence claim where a federal court had found the statute unconstitutional and enjoined its enforcement.

## FACTUAL BACKGROUND

Because this case turns primarily on the issue of submissibility, we recite the facts as shown by plaintiff's evidence and witnesses. Plaintiff was the mother of Sandra Kaiser, born on November 17, 1969. Plaintiff, a single parent, raised Sandra alone, along with four other half-siblings. During her childhood Sandra had a history of behavioral and emotional problems for which she received counseling and psychiatric therapy. At age seven she witnessed the stabbing death of one of her half-brothers. At age eleven she was diagnosed with a conduct disorder for which psychiatric therapy and behavior modification was recommended. By age twelve her problems included drinking alcohol, running away from home, temper outbursts, skipping school, crying, and nightmares about her half-brother's death.

On June 2, 1982 at age twelve, Sandra was hospitalized at Hawthorn Children's Psychiatric Hospital until July 29, 1982 for unmanageable behavior at home and lack of improvement from outpatient therapy. The admitting diagnosis was "Conduct Disorder", "Undersocialized, Aggressive" and "Mixed Specific Developmental Disorder." While in

Hawthorn, Sandra had become angry, hit the wall and broke a bone in her hand. Upon discharge she was prescribed anti-anxiety medication and outpatient therapy at Hawthorn's Outpatient Clinic (O.P.C.).

A psychiatric social worker reported that in February, 1983 Sandra ran away from home. Subsequently, a psychiatrist hospitalized her at St. Vincent's and a deputy juvenile officer was assigned to Sandra because of her aggressive behavior in the community.

On July 1, 1983, at age thirteen, Sandra was admitted to the Hawthorn O.P.C. with an admitting diagnosis of "Conduct Disorder, Undersocialized Aggressive." Her final diagnosis was the same and also included "Mixed Specific Developmental Disorder." In late 1983 Sandra was reported to have run away again and had suffered two unexplained injuries. She and her mother were failing to keep her outpatient counseling appointments and Hawthorn closed her case. In addition to hospitalization and treatment at Hawthorn and St. Vincent's, plaintiff testified Sandra had been at Edgewood Children's Center.

Sandra also had problems in school beginning in about third grade and was expelled from several schools for disciplinary problems and fighting. In the spring semester of 1984, she received "F"s in every class and officials reported poor attendance. In the fall semester of 1984, Sandra missed 37½ days of the 51 days of school prior to her death.

In October 1984, at age fourteen, Sandra told her 21–year–old half-sister, Karen Flynn, that she thought she was pregnant. Flynn went with her to Planned Parenthood for a pregnancy test. Sandra discussed the pregnancy with Flynn and decided to have an abortion. On October 24, 1984, Flynn made a counseling appointment for Sandra with defendant, an abortion provider. Sandra attended this appointment with Flynn and was seen by a supervisor in defendant's Primary Counseling Department. At the counseling session, defendant's employees discussed the abortion procedure and various options. Flynn testified that Sandra expressed no ambivalence about the abortion and that Sandra told the counselors she thought she was too young to have a child.

Defendant's records, offered into evidence by plaintiff, indicate that Sandra told the counselors that plaintiff knew about and supported the abortion and had given her the money to pay for it. Plaintiff testified, however, that she did not know of the abortion, Sandra's pregnancy, or that Sandra had a boyfriend until she died. Plaintiff thought she had given Flynn the money to pay bills.

On October 27, 1984 Sandra returned to defendant with Flynn to have the abortion. At that time Sandra and Flynn together completed a form that requested information under the headings "Social History," "Menstrual History," "Contraceptive History," "Pregnancy History" and "Medical History." They answered "no" to the question under "Medical History," "Have you **ever** received counseling? (**Do not** include any counseling for this pregnancy.)" They also answered "no" to the question "Have you **ever** been **hospitalized** other than for childbirth?" Flynn was aware of Sandra's counseling and hospitalization history, but testified they did not report it on defendant's forms because they believed the questions referred to counseling for pregnancy and hospitalization for physical treatment.

Prior to having the abortion on October 27, 1984, Sandra viewed a film entitled "First Trimester Informed Consent." At trial plaintiff's attorney read into evidence the following excerpt from the film:

"We've tried to describe all the physical feelings you can expect over the next few weeks. Most women feel relieved and very positive. A few women have negative emotional feelings after an abortion. You may feel slightly depressed, but those feelings are normal. Hormones, which were increased during pregnancy, have now suddenly been lowered in your body, and that makes changes which can result in feelings of depression, but severe depression is not to be expected. If you are severely depressed after this abortion it may be that your feelings about ending a pregnancy have not yet been completely resolved. You should see a counselor in an agency near you, either the agency that referred you here, a family service agency, Planned

Parenthood affiliate, or your clergyman, or come back here."

"Call us. We are here to serve your physical and emotional needs. We want to help, but we need you to call us. As a matter of fact, let's make an agreement. Call us within the next forty-eight hours. You'll feel better, and so will we."

A counselor verbally verified the information filled in on the form and discussed the film, the consent form, the abortion procedure and counseling about grieving and loss as well as appropriate after care. Sandra signed a patient consent form for the abortion on October 27, 1984. Flynn signed in the "parent/guardian" space on the form.

Plaintiff, Flynn, and Sandra's half-brother, Donald Tildwell, each testified that, prior to the abortion, Sandra took great interest in her appearance. They testified that after the abortion she stopped taking care of her appearance.

Plaintiff also testified that after October 27 Sandra was very depressed, stayed in her room a lot, and cried. When plaintiff questioned her about her behavior, Sandra told plaintiff she had had arguments with a friend. At trial plaintiff was asked if during this period Sandra acted "crazy in any fashion?" Plaintiff answered, "No, just depressed." Plaintiff specifically testified that Sandra seemed to know what she was doing, functioned normally, went to school, helped around the house, and carried on normal conversations.

Flynn also testified that after the abortion Sandra stayed in her room a lot and cried. However, she also testified that Sandra did nothing foolish and did not act "crazy" or "nuts."

Tildwell also testified that prior to the abortion Sandra was "happy-go-lucky", but was not so afterward. He noticed Sandra seemed depressed on her fifteenth birthday, November 17, 1984, so he bought her a cake. While Sandra was cutting the cake, Tildwell grabbed a rose off the cake and she "blew up", threw handfuls of cake at him, and ran back to her room.

At approximately 10:30 p.m. on November 19, 1984, plaintiff overheard Sandra in an argument with her nineteen year old boyfriend because he "had gotten somebody else pregnant." During the argument, both plaintiff and Tildwell heard Sandra state she was going to jump off a bridge and kill herself. She "stomped off" and left the house. Plaintiff and Tildwell both thought Sandra was "letting off steam." Plaintiff was giving someone a permanent and did not follow her or call out to her. Less than thirty minutes later, a policeman arrived at the home and informed plaintiff that Sandra had been struck by an automobile.

An eyewitness to the accident, which occurred at approximately 11:00 p.m., testified that he saw Sandra holding on to a fence on a bridge over Arsenal Street and then jumped in front of a car traveling below on Arsenal. She appeared to have been rocking back and forth while holding onto the fence, then deliberately let go and jumped far out to the driver's side of the car that struck her. A second car hit her while she was on the ground. Sandra was taken to a hospital and died the next day of multiple injuries. Sandra's blood alcohol was .081 gm.

## PROCEDURAL BACKGROUND

On September 30, 1987, plaintiff filed a wrongful death action against defendant. In her petition, plaintiff alleged defendant was negligent in failing to use the standard of care ordinarily used by members of the medical profession in like or similar circumstances. The alleged negligent conduct included a failure to provide post-abortion counseling to Sandra and a violation of § 188.028 RSMo (1986) governing consent of minors to abortions. She further alleged defendant's negligence was the direct and proximate cause of Sandra's death. Mother sought reimbursement for Sandra's medical expenses and other damages.

On motion by defendant, the trial court struck the reference to § 188.028 from the petition. On April 5, 1990, defendant filed an affirmative defense alleging that Sandra was not "suffering from irresistible impulse insanity at the time of her death by suicide, so

that her voluntary acts were an intervening cause of her death."

The action was tried before a jury, the Honorable Brendan Ryan presiding. Plaintiff's theory at trial was that defendant was negligent either in failing to obtain Sandra's psychiatric history or in failing to follow Sandra and monitor her mental health after her abortion.[1] The jury returned a verdict in favor of defendant. The trial court entered judgment on the verdict.

Plaintiff filed a motion for new trial, claiming numerous instances of prejudicial error, including 1) giving Instruction No. 7, the verdict director, 2) giving Instruction No. 8, and 3) striking the reference to the violation of § 188.028 RSMo.

The trial court denied plaintiff's motion for new trial. The court stated that Instruction No. 7 was properly submitted, but that the converse instruction, Instruction No. 8, was erroneous. However, the court overruled the motion and found plaintiff was not prejudiced by the instructional error because she had not made a submissible case. Specifically, the trial court determined that:

> Plaintiff suffered no prejudice from any instructional error in this case because Plaintiff's own evidence established that Sandra Kaiser was suffering from emotional and psychological problems prior to any actions taken by Defendant, Plaintiff failed to prove any causal connection between the conduct of Defendant and the suicide of Sandra Kaiser, Plaintiff failed to prove that Sandra Kaiser committed suicide as a result of insanity or an irresistible impulse brought about through the actions of Defendant, and Plaintiff failed to prove that suicide is a foreseeable consequence of abortion. The unforeseeable voluntary conduct of Sandra Kaiser was therefore an intervening cause between the conduct of Defendant and the suicide.

## ISSUES ON APPEAL

Plaintiff appeals the judgment of the trial court on three grounds: 1) error in giving instruction 8, the converse instruction, 2) error in giving instruction 7, the verdict director, and 3) error in dismissing her claim of statutory negligence.

## I.

### Instructional Error

■ In her first point plaintiff challenges Instruction No. 8, a converse instruction, because it was neither an affirmative converse nor a true converse as set out in MAI 33.01. Instruction No. 8 states as follows:

#### Instruction No. 8

Your verdict must be for defendant and against plaintiff, if you believe:

First, defendant was not negligent in both:

failing to obtain a psychiatric history of Sandra Kaiser, and

failing to follow Sandra Kaiser and to monitor her mental health after her abortion, or

Second, Sandra Kaiser did not commit suicide, or

Third, Sandra Kaiser did not commit suicide as a direct result of defendant's negligence, or

Fourth, Sandra Kaiser did not commit suicide by reason of being insane, or

Fifth, Sandra Kaiser did not commit suicide without knowing the nature or consequence of her actions, or

Sixth, plaintiff was not damaged thereby.

The trial court overruled plaintiff's objection to this instruction at trial but, on her motion for new trial, found the instruction erroneous. However, the trial court denied the motion for new trial on the grounds that plaintiff had not made a submissible case.

Instruction No. 8 was phrased in the language of an affirmative converse, "Your verdict must be for defendant ... if you believe," but did not hypothesize independent evidence to defeat plaintiff's claim as required by MAI 33.01. Instead, the instruction conversed the propositions submitted in

---

1. Plaintiff challenges the verdict director on other grounds. Plaintiff's proffered verdict director identified the same alternative grounds of negligence.

the verdict directing instruction. Instruction No. 8 failed to comply with MAI 33.01 and was accordingly erroneous. *Hiers v. Lemley,* 834 S.W.2d 729, 734 (Mo. banc 1992).

Defendant admits that Instruction No. 8 was erroneous, but argues plaintiff was not prejudiced by the instructional error because she failed to make a submissible case. If a plaintiff fails to make a submissible case, any instructional error is harmless. *Corcoran v. Southwestern Bell Tel. Co.,* 572 S.W.2d 212, 214 (Mo.App.1978).

*Submissibility*

Having determined Instruction No. 8 to be erroneous, we reach the issue of the submissibility of plaintiff's case because it is a question inherent in deciding whether the instructional error merits reversal or remand for new trial. *Grippe v. Momtazee,* 696 S.W.2d 797, 799 (Mo. banc 1985); *Stucker v. Chitwood,* 841 S.W.2d 816, 821 (Mo.App.1992).

To make a submissible case, substantial evidence is required for every fact essential to liability. *Allison v. Sverdrup & Parcel and Assoc., Inc.,* 738 S.W.2d 440, 455 (Mo. App.1987). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d 872, 880 (Mo.App.1985). The questions of whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law. *Id.*

In determining whether plaintiff has made a submissible case, we view the evidence in the light most favorable to her. *Steenrod v. Klipsch Hauling Co., Inc.,* 789 S.W.2d 158, 171 (Mo.App.1990). We presume plaintiff's evidence to be true and give her the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Loomstein v. Medicare Pharmacies, Inc.,* 750 S.W.2d 106, 112 (Mo.App.1988). However, we do not supply missing evidence or give plaintiff the benefit of unreasonable, speculative, or forced inferences. *Id.* The evidence and inferences must establish every element and not leave any issue to speculation. *Id.*

A party is bound by the uncontradicted testimony of that party's own witnesses, including that elicited on cross-examination. *Hurlock,* 709 S.W.2d at 879. When a party calls a witness who comes within the adverse witness rule, the party is bound by that witness's testimony on direct examination if the testimony is uncontradicted or the only testimony on the subject; however, an adverse witness's testimony on cross-examination is not binding on the calling party. *Id.*

A submissible case is not made if it solely depends on evidence which equally supports two inconsistent and contradictory factual inferences as to ultimate and determinative facts because liability is then left in the realm of speculation, conjecture and surmise. *Loomstein,* 750 S.W.2d at 112; *Hurlock,* 709 S.W.2d at 880.

To establish a submissible case of medical malpractice, plaintiff must establish by substantial evidence that 1) the alleged act or omission failed to meet the requisite standard of care, 2) the act or omission was performed negligently, and 3) a causal connection exists between the act or omission and the alleged injury. *Hiers,* 834 S.W.2d at 732. If a plaintiff fails to establish any of these elements, the plaintiff has not made a submissible case.

Defendant argues that plaintiff failed to make a submissible case on causation as well as on foreseeability and on failure to conform to the accepted level of professional conduct. We agree that plaintiff failed to establish a causal connection between the alleged negligent acts and the injury and do not reach defendant's remaining arguments.

*Causation*

Proximate cause is that cause which produces a particular injury without the intervention of an independent cause, in the absence of which the injuries would not have been inflicted. *Vann v. Town Topic, Inc.,* 780 S.W.2d 659, 661 (Mo.App.1989). An intervening resulting cause is a new and independent force which so interrupts the chain of events initiated by defendant's alleged

negligence as to become the responsible, direct, and proximate cause of the injury. *Id.*

■ Where the injury is death caused by a voluntary suicide, the suicide is considered a new and independent intervening act which breaks the causal connection between the allegedly negligent act and the death. The Missouri Supreme Court has expressed this rule as follows:

"Suicide, due to a mind disordered by an accident or injury or even by an assault accompanied by mental torture, has been held not so related to the wrongful acts as to furnish a ground for the action, where the act of suicide of the insane person is voluntary and done with knowledge of its purpose and physical effect; but where, as the proximate result of the injury the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life, his act being involuntary, the act causing the injury has been held to be the proximate cause of death." 25 C.J.S. Death § 25, p. 1094. See also *Scott v. Greenville Pharmacy, Inc.,* 212 S.C. 485, 48 S.E.2d 324, 11 A.L.R.2d 745 [1948]; Annotation, 11 A.L.R.2d 751, 757; *Tate v. Canonica,* 180 Cal.App.2d 898, 913, 914, and 915[5], 5 Cal.Rptr. 28 [1960]; *Orcutt v. Spokane County,* 58 Wash.2d 846, 364 P.2d 1102[1] [1961]; *Arsnow v. Red Top Cab Co.,* 159 Wash. 137, 292 P. 436[3] [1930]; '2 Restatement, Torts, § 455 (comment a, b, d); Prosser, The Law of Torts, 2d ed., § 49, pp. 273, 274; 16 Am.Jur., Death, § 81.

*Wallace v. Bounds,* 369 S.W.2d 138, 143–44 (Mo.1963).

The Restatement rule cited by the supreme court reads as follows:

§ 455. Acts Done During Insanity Caused by Negligent Conduct

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Restatement (Second) Of Torts, § 455 (1965).

■ To make a submissible case of proximate cause in a situation where there is a death by suicide, the evidence must establish that defendant's allegedly negligent act caused decedent to become insane in the sense that 1) the insanity prevents the injured party from understanding what he or she is doing or from understanding its inevitable or probable consequences or 2) the injured party's act is done under an insane impulse which is irresistible because the insanity has prevented his or her reason from controlling his or her actions. *Id.,* cmt. b and c. The evidence must also establish that the decedent committed suicide while so insane. *Id.,* cmt. a.

Plaintiff presented no evidence that Sandra became insane as so defined. Plaintiff called Dr. Dermott Smith as her expert medical witness. Dr. Smith is a psychiatrist, professor of psychiatry at St. Louis University, and clinical director at Wohl Hospital. He had never met or treated Sandra, but reviewed her medical and psychiatric records and read family members' depositions.

On the issue of Sandra's mental condition after the abortion, Dr. Smith testified that, in his opinion, Sandra had been suffering from a major depression at the time of her death and had been for several weeks, that the suicide was a direct consequence of this depression, that the abortion was the "straw that broke the camel's back," and that Sandra stayed in her room until she made up her mind that she was going to kill herself.

Dr. Smith was asked if there is any sense in which "a depressed person committing suicide is bereft of the [sic] reason?" He answered "Yes, they suffer from at least two depressions. One is I'm hopeless, and two is there's no way in the world that I can get enough help to get me away from this, and a possible third one, I'm worthless. Those are delusional ideas." He further testified that "a fourteen-year-old girl who is pregnant is by definition to some extent emotionally dis-

turbed and upset," that abortions represent a sense of loss to a woman and "[i]t is certainly not unreasonable to expect someone after an abortion, even though she thinks she ought to have an abortion, to be depressed."

However, Dr. Smith did not testify that Sandra was suffering from an uncontrollable impulse at the time of the suicide or that she did not understand the consequences and risks of her acts. To the contrary, Dr. Smith testified that on the night of the suicide, in his opinion, Sandra had not lost control, she was fully aware of the purpose and physical effect of her act of when she jumped into traffic, she knew what the purpose was and the effect, and that if she desired she could have controlled her actions.

This expert testimony was consistent with the observations of plaintiff and other family members who testified that, although Sandra experienced behavioral changes after the abortion, she appeared to be in control of her actions, generally functioned normally, and had done nothing foolish and was not acting "crazy" or "nuts."

There was no substantial evidence that Sandra's suicide was committed while she was insane in the sense she was suffering from an uncontrollable impulse or while she did not understand the consequences of her acts. Without such evidence, plaintiff failed to make a submissible case on the issue of whether defendant's failure to obtain a psychiatric history or to monitor Sandra's mental health proximately caused her death by suicide. Causation was an essential element of her case. Accordingly, the error in jury Instruction No. 8 was not prejudicial.

## II.

Plaintiff next asserts the trial court prejudicially erred in submitting Instruction No. 7, the verdict director, to the jury. We need not address this contention because, even if the instruction were erroneous, our finding that there was no submissible case would render any such error non-prejudicial.

## III.

Plaintiff last asserts that the trial court erred in dismissing her claim of statutory negligence based on § 188.028 RSMo, governing consent of minors to abortions. She argues that she was in the class of persons protected by the statute and was not a party to the action in which the statute's enforcement was enjoined, and thus was not bound by the injunction.

A statute may be pleaded as defining the applicable standard of care in negligence actions under certain conditions. *Monteer v. Prospectors Lounge, Inc.*, 821 S.W.2d 898, 900 (Mo.App.1992). However, "[t]he invalidity of an enactment will usually mean that it should have no effect under any theory in setting the proper standard of conduct." Harper, James & Gray, The Law Of Torts § 17.6 (2d ed. 1986). *See,* e.g., *Bertrand v. DiCarlo*, 111 R.I. 509, 304 A.2d 658, 661 (1973).

On November 4, 1983, the federal district court for the Western District of Missouri found § 188.028 unconstitutional and enjoined the State of Missouri from applying, implementing, relying upon, enforcing or threatening to enforce § 188.028, pending the promulgation and adoption of civil procedure rules by the Missouri Supreme Court consistent with the U.S. Constitution. *T.L.J. v. Ashcroft*, 585 F.Supp. 712, 713 (W.D.Mo. 1983). The order was to remain in effect until further order of the court. *Id.* This order remained in force until it was vacated on August 7, 1985. *C.L.G. v. Webster*, 616 F.Supp. 1182, 1186 (W.D.Mo.1985).

Sandra consented to and had the abortion on October 27, 1984 which was during the period the injunction was in force and the statute was deemed invalid. At that time, the statute could not be used to define a duty of care or standard of conduct. This result applies even if plaintiff was in the class the statute purported to protect and was not a party to the proceeding declaring it unconstitutional. The trial court properly struck the reference to § 188.028.

The judgment of the trial court is affirmed.

CARL R. GAERTNER, P.J., and CRAHAN, J., concur.