Kimberly BEER, et al.,
Plaintiffs/Appellants,

v.

The UPJOHN COMPANY,
Defendant/Respondent.

No. 68225.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 31, 1997.

Application to Transfer Denied
May 27, 1997.

Rochelle Kaskowitz, Michael R. Torrence, Richard K. Coffin, Coffin & Torrence, St. Louis, for appellant.

Andrew See, David W. Brooks, Lori C. McGroder, Shook, Hardy & Bacon, L.L.P., Kansas City, for respondent.

GERALD M. SMITH, Judge.

Plaintiffs appeal from the action of the trial court in sustaining defendant's motion for directed verdict at the close of plaintiffs' case in this wrongful death action based upon product liability. We affirm.

■ Joe Beer, the decedent, was forty-three years old in 1987. He was having trouble sleeping and consulted with his family physician on December 9, 1986. The physician prescribed Halcion, a sleeping medication product of defendant. Beer refilled the prescription once. On January 15, 1987, during the night, Beer went outside his residence in his nightclothes and shot himself one time in the chest with a rifle. The medical examiner determined the death to be a suicide.[1] His family brought suit against Upjohn on strict product liability and negligent failure to warn.

The trial court dismissed the product liability count during the trial and sustained defendant's motion for directed verdict on the negligence count at the close of plaintiffs' case, after eleven days of trial. The stated reason for granting the motion for directed verdict was the failure of plaintiffs to establish that Halcion was the proximate cause of Beer's death. Plaintiffs appeal from both the dismissal of the products liability claim and the granting of the motion for directed verdict.

In reviewing the granting of a directed verdict, we consider the evidence in the light most favorable to the plaintiffs, accept as true that which is not entirely unreasonable or opposed to physical laws and grant plaintiff the benefit of all favorable inferences from the evidence. *Spencer v. Millstone Marina, Inc.*, 890 S.W.2d 673 (Mo.App. 1994)[11,12]. The defendant is entitled to a directed verdict at the close of the plaintiffs' case if "no reasonable minds" would differ in interpreting the evidence. *Spencer, supra.* However, a submissible case is made only when every fact essential for liability is predicated on legal and substantial evidence. *Jenkins v. Revolution Helicopter Corp. Inc.*,

1. In an action against an insurance company the widow contended that the death was an accident caused by Beer tripping on his rifle.

925 S.W.2d 939 (Mo.App.1996)[14–16]. Applied to this case, plaintiffs must demonstrate substantially that Halcion proximately caused Beer's suicide.

Halcion is used for short-term treatment of insomnia. It is a benzodiazepine, which depresses the central nervous system. Halcion has a half-life of 2 to 3 hours, which is very short when compared to most benzodiazepines. Half-life is the length of time it takes for one-half of the drug to leave the system. The advantage of Halcion over the "longer acting" benzodiazepines is that the side effects of drowsiness and lethargy on the next day are lessened, particularly in the morning. However, there was expert testimony that, unlike the other benzodiazepines which have a gradual "let down," Halcion "gives a jolt in the process." There was expert testimony that Halcion specifically affects the GABA (gamma amino butyric acid) system of the brain. The nerves in the brain have receptor sites which GABA stimulates. The action of Halcion on the receptors is essentially the opposite of GABA. The brain, over time, reacts to prevent the impact of Halcion by decreasing the sensitivity to Halcion or to GABA and by reducing production of GABA in the nerve endings.

Halcion begins to lose effectiveness after 10 to 14 days due to changes in the GABA receptors. Low GABA levels can lead to hyperexcitability and disinhibition of aggressiveness. Because Halcion essentially shuts down the inhibitory system due to too much input, when the drug wears off the behavioral result is not one of calming but of excitation. Aggressiveness towards self and others is one of the reactions which may be seen with Halcion.

There was sufficient evidence in the record to establish that Upjohn was aware of the possible side effects of Halcion, including depression and suicidal thoughts, and that it did not warn of those side effects and did not specifically advise that the drug should not be used for more than 14 days without careful continued evaluation of the patient. The doctor who prescribed the medicine for Beer, who testified for defendant out of turn, stated that such warnings would not probably have affected his prescribing of the drug or caused him to do anything differently as far as Beer was concerned. Defendant contends that because the doctor was a "learned intermediary" his testimony establishes that proximate cause does not exist because the additional warnings which plaintiffs contend should have been given would not have caused Beer's treatment to have varied from what it was. The doctor's testimony was somewhat equivocal, however, and we cannot conclude as a matter of law that a more positive or forceful warning would not have affected his treatment of Beer.

Defendant also contends that the evidence did not establish that Beer took the drug on the night of his suicide. No traces of the drug were found in Beer's post-mortem blood screen. An expert testified that because of the short half-life the drug might not have been found in his blood even if he did take a pill that evening. There was sufficient circumstantial evidence to allow the jury to draw the inference that Beer took the drug nightly and had taken it on the night of his suicide.

■ Even with evidence that Beer probably took Halcion each night as prescribed and that Upjohn did not warn the learned intermediary of the drug's potentially dangerous effects, plaintiff must establish that Halcion proximately caused Beer's suicide. Missouri treats suicide differently for liability purposes depending on whether it occurs while the decedent is sane or insane. If the decedent is insane then the suicide is treated as accidental or non-intentional. If the decedent is sane then the suicide is a voluntary act and constitutes an intervening cause destroying the proximate causation link with the defendant. *Skaggs v. Aetna Life Insurance Co.*, 884 S.W.2d 45 (Mo.App.1994)[1]; *Eidson v. Reproductive Health Services*, 863 S.W.2d 621 (Mo.App.1993)[3].

We addressed this issue at length in *Eidson, supra*. There, a fourteen year old girl received an abortion from defendant. She had a long history of behavioral disorders before she obtained the abortion. Shortly before she intentionally threw herself in front of an automobile she had an argument with her boyfriend. Her mother, the plaintiff, contended that defendant's failure to

provide sufficient post-abortion counseling led to the suicide. The jury found for the defendant and we affirmed on the basis that plaintiff had not made a submissible case.

In *Eidson, supra* at [10], we held:

To make a submissible case of proximate cause in a situation where there is a death by suicide, the evidence must establish that defendant's allegedly negligent act caused decedent to become insane in the sense that 1) the insanity prevents the injured party from understanding what he or she is doing or from understanding its inevitable or probable consequences or 2) the injured party's act is done under an insane impulse which is irresistible because the insanity has prevented his or her reason from controlling his or her actions.... The evidence must also establish that the decedent committed suicide while so insane.

There was no evidence in Beer's medical records specifically diagnosing that Beer was suffering from any psychosis or any form of insanity. It was plaintiffs' theory that the Halcion caused Beer to lose the ability to control his impulses and that his suicide was therefore the product of an irresistible impulse. The plaintiffs utilized a psychiatrist to establish this critical fact. That expert testified that he arrived at his conclusion by using a methodology generally accepted in the psychiatric field. He did not testify that his conclusions were generally accepted in that field and testified that in fact his opinions concerning the correlation between mental illness and drugs were not the generally accepted opinions within that field. The expert's testimony was that Halcion has the capacity to seriously compromise the impulse control mechanisms of the brain.

The psychiatrist examined Beer's medical records and reviewed family interviews conducted after the suicide. The expert believed that this information did not indicate that Beer was a person who would be expected to commit suicide. He further considered that Beer, after taking Halcion, developed short temper, hand tremors, and inattentive driving. He believed that these behavioral changes were indicative of Halcion's compromise of the brain's impulse control system. The psychiatrist concluded that Halcion was the cause of Beer's suicide because Halcion

could cause loss of impulse control and because he could see no other reason for Beer's suicide.

The only testimony which directly addressed the issue of an insane irresistible impulse was the following:

Q. Based on the data that you have investigated with respect to the actions and the information and the condition of Joe Beer up to the early morning of January 15th, 1987, do you have conclusions as a clinical psychiatrist as far as whether Joe Beer was in conscious control of his actions at that time?

A. Yes.

Defense Counsel: Objection, no foundation.

The Court: Overruled.

Q. What is your opinion?

A. That he did not have conscious control over his actions.

During cross-examination the doctor admitted that in deposition he had stated that "We can't know for certain what was going on in [Beer's] mind [at the time he committed suicide]". He testified that Beer did not suffer from major depression. He also stated that the diagnostic criteria utilized by him to establish that Beer did not suffer from major depression did not have specific validity to determine depression but were useful. He admitted that Beer evidenced symptoms of depression prior to the beginning of his Halcion ingestion. It was his opinion that Halcion can cause depression.

It is noteworthy that the psychiatrist's opinion quoted above was not stated to be within "a reasonable degree of medical certainty". Traditionally, such opinions by medical experts have been required to be stated to be within that framework. *Tompkins v. Kusama*, 822 S.W.2d 463 (Mo.App.1991); *Holmes v. Gamewell*, 712 S.W.2d 34 (Mo. App.1986)[7]; *Wagner v. Piehler*, 879 S.W.2d 789 (Mo.App.1994)[3]. Some cases have been less stringent in applying this requirement particularly where no proper objection was made to the question. *Bynote v. National Super Markets*, 891 S.W.2d 117 (Mo.banc 1995)[17,18]. In *McGrath v. Satellite Sprinkler Systems, Inc.*, 877 S.W.2d 704 (Mo.App. 1994)[3–5], the court stated that "The ultimate importance of the expert testimony is

to be determined from the testimony as a whole and less than direct statements of reasonable medical certainty will be sufficient."

Where an expert witness is called upon to express an opinion based on facts of which he has no firsthand knowledge, he must be asked by use of a hypothetical question to assume those facts. *Miller v. Weber,* 688 S.W.2d 389 (Mo.App.1985)[2]. The opinions of the psychiatrist were not based upon "first hand" knowledge. As indicated the opinion of the psychiatrist was not expressed to be within reasonable medical certainty. The doctor admitted that his opinions concerning drugs and psychiatric treatment were at war with the majority of psychiatrists. The question to which he rendered his opinion did not hypothesize specific facts upon which he based his opinion. We cannot conclude that the testimony given here, taken as a whole, was sufficient to allow a jury to find that Beer committed suicide pursuant to an insane irresistible impulse without resorting to conjecture and speculation.

The *Eidson* standard for submissibility of the suicide to a jury requires plaintiffs to demonstrate that Upjohn's negligent act made Beer insane to a point where he could not understand the consequences of his act or he could not resist taking insane actions. At no point did the psychiatrist state that Beer was insane or that an insane irresistible impulse caused his suicide. He in fact admitted that he had made his conclusion because he could find no other cause. The lack of medical certainty prevented the psychiatrist's opinions from becoming "substantial evidence" for a jury's consideration.

The trial court did not err in directing a verdict. In view of our holding of absence of proof of proximate causation it is unnecessary to address plaintiffs' contention that the court erred in dismissing the product liability count.

Judgment affirmed.

CRANE, P.J. and PUDLOWSKI, J., concur.