Patricia BLANKE, Plaintiff/Respondent,

v.

Bradley F. HENDRICKSON,
Defendant/Appellant.

No. 69564.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 25, 1997.

Motion for Transfer to Supreme
Court Denied May 14, 1997.

**944**

Bradley James Bakula, St. Louis, for defendant/appellant.

Stephen G. Bell, St. Louis, for plaintiff/respondent.

CRAHAN, Presiding Judge.

Bradley Hendrickson ("Seller") appeals the judgment entered against him following a bench trial of Patricia Blanke's ("Buyer") claim that he fraudulently misrepresented that the basement of the home he sold her had a "slight leak which has been repaired, no problem since repaired." Seller claims that the judgment is not supported by substantial evidence that the basement was, in fact, leaking water prior to the sale or that he knew it was leaking. We reverse.

On appeal of a judgment in a court-tried case, we must uphold the decision of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Commerce of St. Louis, N.A. v. Dooling,* 875 S.W.2d 943, 946 (Mo.App.1994).

The nine elements of fraud which must be proven in order to recover under Missouri law are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or his ignorance of the truth; (5) the speaker's intent that his statement be acted upon; (6) the hearer's ignorance of the falsity of the statement; (7) his reliance on the truth of the statement; (8) the hearer's right to rely on the statement; and (9) the hearer's consequent and proximate injuries. *Colgan v. Washington Realty Co.,* 879 S.W.2d 686, 689 (Mo.App. 1994). The key elements in dispute in this case are whether Seller's representation was false and whether he knew it was false or was ignorant of the truth when he made the representation.

Fraud is never presumed and when fraud is alleged the burden of proof as to each element falls upon the party asserting the fraud. *Harper v. Calvert,* 687 S.W.2d 227, 229 (Mo.App.1984). Failure to prove any of the requisite elements is fatal to a claim for fraud. *Id.* A finding of fraud must rest on something more substantial than suspicion, surmise and speculation. *Weaver v. Travers,* 631 S.W.2d 81, 83 (Mo.App.1982). Generally, a party fails to make out a case of fraud when the facts and circumstances presented are as consistent with honesty and good faith as they are with fraud. *Macon–Atlanta State Bank v. Gall,* 666 S.W.2d 934, 941 (Mo.App.1984). The truth or falsity of the representation is determined as of the time it was made and as of the time it was intended to be relied and acted upon. *Rigby Corp. v. Boatmen's Bank and Trust Co.,* 713 S.W.2d 517, 540 (Mo.App.1986).

To make a submissible case, substantial evidence is required for each fact essential to liability. *Eidson v. Reproductive Health Services,* 863 S.W.2d 621, 626 (Mo. App.1993). Substantial evidence is evidence which, if true, has probative force upon the issues and from which the trier of facts can reasonably decide a case. *Id.* The questions of whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law. *Id.* A submissible case is not made if it solely depends on evidence which equally supports two inconsistent and contradictory factual inferences because liability is then left in the realm of speculation, conjecture and surmise. *Id.*

Buyer was the only witness to testify in support of her claim. The home in ques-

tion was approximately fifty years old at the time of sale. In August, 1992, Buyer toured the home, including the basement, and submitted a contract, which Seller accepted. As part of the sale transaction, Seller completed a standard disclosure form, which was provided to Buyer. The disclosure form included the following information (portions handwritten by Seller are capitalized):

> Basement. Has there been evidence of or problems with water leakage? Yes _X_ No _._ If yes, please explain, including the frequency and extent of the problem. *SLIGHT LEAK WHICH HAS BEEN REPAIRED, NO PROBLEM SINCE REPAIR.*

About a week after the contract was accepted, Buyer again inspected the home, this time with a professional building inspector she retained. The building inspector's report, received in evidence as part of Buyer's case, included the following observations:

> *Site*
>
> The property is located in an older city neighborhood on a corner lot. It is fairly level. It will be important to keep downspouts discharged well away from the house and foundation to avoid pooling or collection of water. *The owner reports no significant problems of water seepage into the basement.* More will be discussed under the basement section of this report. (emphasis added).
>
> \* \* \*
>
> *Basement*
>
> The basement has one partially finishes [sic] room with a drop-in ceiling, carpeted floor and paneled walls. *There is no staining suggesting a history of water seepage.[1] Owner reported none. You should confirm with further conversation if desired.*

Obviously these comments do not guarantee a waterproof basement for the future. All basements, by the nature of their construction, have the potential to leak under the right conditions and changing conditions in the future cannot be predicted on the basis of a brief single visit. (emphasis added).

Buyer conducted a final walk-through of the home in late September, 1992, about a week prior to closing. Buyer did not note any dampness, musty odor or other evidence of leakage on any of her three visits prior to closing the sale. Nor did Buyer notice any evidence of leaking in the basement until about a month after she moved into the home.[2] Despite her inspector's suggestion that she follow up with the owner about the water seepage, Buyer never discussed the disclosure statement with Seller.

Although Buyer was in the basement frequently to unpack boxes and do laundry, she first noticed evidence of leaking in the basement in about mid-November, 1992. Thereafter, every time it rained, the carpeting in the basement would become extremely wet. The leaking became progressively worse over time. After approximately six months, Buyer removed some of the drywall from the finished portion of the basement and discovered several cracks leaking water. According to Buyer, at least one crack was wide enough that she could see earth on the other side.[3] The lumber supporting the drywall showed evidence of water damage. Approximately six months after discovery of the cracks, and after the heavy rains associated with the 500 year flood of 1993, Buyer had a waterproofing system installed to remedy the problem. Documentary evidence of the cost of repairs was received in evidence.

After Buyer rested, Seller moved for a directed verdict, which was denied. Seller

---

1. Elsewhere, the report states it had rained two days prior to the inspection. National Climactic Data Center records, received by stipulation as part of Seller's case, indicated there was 1.76 inches of precipitation two days prior to the inspection and an additional 1.12 inches of precipitation on the day before the inspection.

2. Buyer took possession of the home on September 27, 1992 but did not move in until mid-October, 1992.

3. Photographs of the cracks were received in evidence and are part of the record on appeal, although it is unclear from the record what testimony pertains to what photographs, or exactly when they were taken.

then presented evidence, which we must disregard except insofar as it aids Buyer's case.

Seller testified that he purchased the home in 1986. At the time he purchased the home, the basement was unfinished and the foundation walls had cracks, some of which slightly leaked. In the summer of 1988, Seller decided to improve and finish a portion of the basement. Before doing so, Seller undertook to repair the leaks and cracks in the foundation walls. Seller was not a professional repairman but he researched how to repair the cracks to stop the leaks by reading "how to" books and by seeking advice from his father and from employees at hardware stores. He filled the main cracks with silicone caulk, put mortar patches over that and painted over that with waterproof paint. He also chiseled some portions of loose concrete from the wall, filled in with silicone caulk and mortared over the area. Although Seller acknowledged it was possible that sealing one crack could increase pressure on others, he did not caulk or paint every crack if it was not a "leaking situation." Seller considered the cracks to be typical basement foundation cracks.

After completing his repairs to stop the leaks, Seller then finished a portion of the basement where repairs had been made by putting up dry wall, wood paneling, cedar baseboards and a drop ceiling. Seller also installed indoor-outdoor carpet and a dry bar. He then placed a pool table, television, couch and bar stools in the basement, which he used regularly thereafter. The rest of the basement was left unfinished as a laundry room.

Seller testified that after he completed the foregoing repairs, he never experienced any more leaking and had no knowledge of any leaks in the basement at the time of sale.

Cornelia Manessa, Seller's real estate agent, testified that she had been in the basement on numerous occasions in 1991 and 1992 and saw no evidence of water leakage. Seller's friend, Mr. Mark, also testified that he had been in the basement at least weekly since Seller purchased the home and even more frequently around the time of the sale because he helped Seller move. He had been in the basement on several occasions during periods of heavy rain. He saw no indication of any leakage after Seller made his repairs.

Seller urges that the foregoing evidence is insufficient to establish that the basement walls were, in fact, leaking either at the time he completed the disclosure statement or at any time prior to closing of the sale. Nor, Seller argues, assuming *arguendo* that there was a leak, was there any evidence that he knew about it. We find that there is no substantial evidence to support a finding that Seller's representation was false, either when he made it or at any time prior to closing the sale.

Buyer offered no evidence that the basement was leaking prior to the closing of the sale and her own testimony tends to establish that it did not begin leaking until about a month after she moved in. Buyer testified that, from the time she first noticed the leaking, the carpet would become soaking wet every time there was a heavy rain. Buyer, however, detected no evidence of leaking on her three visits to the home prior to the sale, at least one of which was soon after a period of heavy rainfall. Nor did Buyer detect any evidence of leaking during the first month of her occupancy, although she was in the basement frequently to unpack cartons stored there. Buyer's testimony and her inspector's report confirm the absence of any evidence of water seepage on the baseboards or drywall. There was evidence that the lumber supporting the drywall was water damaged at the time Buyer removed the drywall to determine the source of the leaking. However, it would be surprising if there was no evidence of water damage at that point in view of Buyer's testimony that she experienced leaking after every heavy rain in the six months prior to her removal of the drywall. Buyer offered no expert testimony to establish that the degree or nature of the water damage were indicative of a lengthier period of leaking. *Cf., Wilson v. Murch,* 354 S.W.2d 332, 336–37 (Mo.App.1962) (upholding liability in fraud action based on expert testimony that damage to furnace must have occurred quite some time prior to sale and could not have escaped owners' notice).

In her brief, Buyer makes no claim that she produced any direct evidence of leaking prior to sale but urges that Seller may nonetheless be held liable because he failed to disclose the extent of the cracks in the basement walls and concealed them from her by putting up drywall over them. In support of this theory, Buyer directs our attention to *Barylski v. Andrews,* 439 S.W.2d 536, 539 (Mo.App.1969). In *Barylski,* defendants were found guilty of fraud in failing to disclose to the purchasers that the house had been charred in a fire several years earlier. *Id.* at 541. Approximately one year before placing the house on the market, defendants covered the burnt portion of the basement with sheet rock and painted the remaining charred portions of the basement white. *Id.* at 538. When showing the house, defendants removed the light bulbs from the basement, claiming they had been removed because the children left the lights on. *Id.* In response to inquiries about the condition of the house by the purchasers, the owner replied that, "the house is in fine condition." *Id.* The court determined that the acts of the defendants in covering, concealing and painting the burned and charred portions of the home and the affirmative representation that the house was in fine condition tended to cover up the truth and distract the buyers from the true condition of the home. *Id.* at 540.

For a number of reasons, Buyer's reliance on *Barylski* is misplaced. In the first place, the petition in this case made no claim that Seller was under any obligation to disclose cracks in the basement walls. The petition claimed only that Seller had misrepresented that he had experienced no problems with leaking since his repairs. Further, in this case, unlike *Barylski,* Seller disclosed the past problems and the fact that the problem had been repaired. As long as the repairs continued to hold, the drywall did not conceal anything inconsistent with what Seller represented.[4] Nor is it reasonable to assume that drywall was installed for purposes of concealing a leak. Buyer offered no evidence suggesting that the drywall was installed in contemplation of an imminent sale. If, as Seller testified, he finished the basement several years before so he could use it for his own recreational purposes, it would have been wasteful folly to do so if Seller did not believe the leaks had been repaired. Otherwise he was putting all of his own furnishings at risk. Seller had no reason to attempt to conceal a leak from himself.

Alternatively, Buyer suggests that Seller may be held liable because he failed to disclose the non-professional, do-it-yourself nature of the repairs. We disagree. Seller made no representation that the repairs had been professionally done or that they would last indefinitely. Seller represented only that there had been no problems since the repair. Had Buyer heeded her inspector's advice and discussed the situation with Seller, she presumably could have learned what Seller had done and reached her own conclusions about the suitability of the repairs.[5] Buyer was on notice that there had been problems in the past and cannot now hold Seller responsible for her failure to make further inquiry. *See Mobley v. Copeland,* 828 S.W.2d 717, 726–27 (Mo.App.1992).

Judgment reversed.

GRIMM and HOFF, JJ., concur.

---

4. Nor did Buyer produce any evidence that the cracks were as widespread or severe at the time the basement was finished more than four years prior to her removal of the drywall and discovery of the cracks. As Buyer's inspector noted in his report, it is impossible to predict changing conditions that may cause a basement to leak.

5. Seller testified that he did describe the work he performed either to Buyer's inspector or to her father during one of Buyer's visits prior to the sale. The inspector's report indicates that the inspector may have had some discussion with Seller. It is undisputed, however, that Buyer herself never made any inquiry as to the nature of the repairs.