Anne M. STEWARD, Plaintiff/Appellant,

v.

Clifford L. GOETZ and Leonard D. Vines, Defendants/Respondents.

No. 69670.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 14, 1997.

Application to Transfer Denied
June 17, 1997.

Fairfax Jones, Terry Luecjenhoff, Casserly, Jones, Brittingham & Edwards, P.C., St. Louis, for appellant.

Martin M. Green, Joe D. Jacobson, Green Schaaf & Margo, P.C., Clayton, for respondent, Goetz.

Robert S. Rosenthal, Michael M. Flavin, T. Michael Ward, Brown & James, P.C., St. Louis, for respondent, Vines.

CRANE, Presiding Judge.

Plaintiff Anne Steward and defendant Clifford Goetz each owned one half of the shares of Crestwood Builders Supply, Inc. (CBS). In December, 1988 they sold CBS for $5,000,000.00. Goetz and Steward were represented by Goetz's law partner, defendant Leonard Vines, in the transaction. Steward gave the buyers an unconditional guarantee of the accuracy of CBS's financial statements. In January, 1989 an audit showed actual inventory to be approximately $280,000.00 less than shown on the financial statements which, when combined with other discrepancies in accounts payable and receivable, resulted in the financial statements overstating CBS's financial condition by $292,199.00. Steward paid buyers their claim of $292,199.00. Steward then filed an action against Goetz for misrepresentation, claiming he misrepresented that there was no inventory shortage, and against Vines for legal malpractice, alleging he failed to advise her that she was making an unconditional warranty. The jury returned verdicts in Steward's favor. The trial court sustained Goetz's motion for a new trial and Vines's motion for judgment notwithstanding the verdict (JNOV), and, alternatively, Vines's motion for a new trial. Steward appeals.

On appeal Steward asserts that the trial court erred in granting Goetz a new trial because of instructional error, that the trial court erred in granting Vines a JNOV because the verdict was against the weight of the evidence, and, alternatively, a new trial on the same grounds, and, if the verdict against Goetz is reinstated on appeal, that the trial court erred in denying plaintiff prejudgment interest. Goetz asserts that plaintiff failed to make a submissible case against him.

With respect to Goetz, we hold that plaintiff failed to make a submissible case; we therefore reverse the grant of a new trial and remand the case to the trial court with instructions to enter judgment notwithstanding the verdict in favor of Goetz. We affirm the JNOV in favor of Vines.

### FACTS

Because the primary issues on appeal involve submissibility, we recite the facts in the light most favorable to plaintiff and disregard defendants' evidence which does not support plaintiff's case. We include those facts which plaintiff put into evidence through the uncontradicted testimony of her witnesses and the uncontradicted direct examination testimony of the witnesses she called under the adverse witness rule.

#### CBS Background

Steward was a certified public accountant, who owned a small accounting firm performing accounting and tax services. She met Goetz, an attorney, while she was providing

accounting services and he was providing legal services for the prior owner of CBS. Steward and Goetz acted as accountant and attorney for CBS until 1981 when they and a third investor purchased the company. After the purchase Steward and Goetz continued to provide accounting and legal services, and the third investor managed the business.

In 1986 Steward and Goetz became the sole and equal shareholders of CBS and continued as members of the board of directors. Goetz assumed the duty of running CBS on a day-to-day basis. He was the chief executive officer and chief operating officer of the business. Although he continued his law practice, he spent more than fifty percent of his time at CBS. The department heads at CBS reported to Goetz and kept him advised of the affairs of the business on a daily basis.

Steward was treasurer of the company. She visited CBS three times per month for a couple of hours each visit. She would receive the sales receipts and payment records from the office manager and then compile financial statements and produce tax returns, payroll reports, and workers' compensation reports from the information given her. In 1987 Goetz hired a full-time comptroller who reported to him. He put the company on a payroll service, relieving Steward of her payroll duties. He also acquired a computer and hired a computer expert. Thereafter, the computer was used to generate the financial statements. The computer produced daily printouts showing sales, expenses, and inventory. Steward did not compile the financial statements once the computer was put into use. She continued to do the company's tax returns, met weekly with the comptroller, reviewed the financial statements, and reviewed problems of policy.

*CBS–Inventory History*

Shortly after Goetz assumed management of CBS, Price Waterhouse took a physical count of the inventory. It found $248,000.00 more inventory than was recorded on the company's books. Steward discussed with Goetz that the additional inventory increased the company's income taxes.

In 1987 another physical count of the inventory was conducted by an outside firm under the supervision of the CBS comptroller. This count reflected a shortage of $152,-000.00 or $155,000.00. Steward discussed the shortage with Goetz and other company employees. They said that there was no actual shortage because the counting process had been inaccurate and told her no changes should be made to the company books.

In the spring of 1988, CBS personnel conducted another physical inventory and found a shortage of $170,000.00 on the perpetual inventory. In September, 1988 Steward filed an amended tax return to reflect the correct inventory figure and corrected the perpetual inventory records to reflect the actual inventory count, thereby correcting the January 31, 1988 inaccuracy.

In November, 1988 the comptroller sent Steward the October 31, 1988 financial statement. In a handwritten note he advised Steward that $134,000.00 in windows were in the warehouse and were not reflected on the books of the company. Steward knew that the November, 1988 financial statements likewise did not show the windows in inventory. CBS's principal asset on its financial statements was inventory.

*Sale of CBS*

In the fall of 1988, Steward and Goetz began negotiating the sale of their stock in CBS for $5,000,000.00 with Tom Barta and Bert Wenneker (the buyers). The $5,000,-000.00 price was significantly higher than had been discussed with any prior potential buyer. The buyers' accountant was Robert Kolb, C.P.A., who assisted them with the purchase. Kolb and the buyers toured CBS which consisted of a plant and a warehouse containing approximately $1,800,000.00 in inventory. The parties signed a Letter of Intent on November 4, 1988. The parties agreed that the transaction was to close before the end of the year and there was to be no physical inventory count taken before closing because it would be too costly for the buyers and may have delayed closing beyond 1988. After the price was negotiated, Goetz hired Vines, a partner in Goetz's law firm, to draft the closing documents. On November 21, 1988 Goetz introduced Steward to Vines and told her he had hired his partner Vines

to represent himself and Steward in the sale of the business, to which she agreed.

On December 2, 1988 Steward, Goetz, Vines, Barta and Kolb met in Goetz's office to review a draft agreement for the sale and purchase of stock. Steward understood that she and Goetz were going to be sharing responsibilities for the financial statements equally. Steward agreed to take sole responsibility for the taxes because she knew the company's taxes. Steward testified that, from the beginning of negotiations, she understood that both she and Goetz would equally warrant the accuracy of the financial statements to the best of their knowledge. In the first draft of "An Agreement for Sale and Purchase of Stock," drafted by Vines and reviewed by the parties at the December 2, 1988 meeting, the sellers warranted that the CBS financial statements were "materially true, complete and correct to the best of the Corporation's and Existing Shareholderss' [sic] knowledge." All of the drafts prepared by Vines after the December 2 meeting retained this language. Steward testified she received four of the seven drafts prepared by Vines. Steward attended another meeting on December 8 at which they reviewed a draft which incorporated the December 2 discussions.

In mid-December Kolb advised the buyers to obtain independent counsel. They retained the law firm of Thompson & Mitchell, which also represented the lender in the transaction, Mercantile Bank. Thompson & Mitchell attorneys Deborah Dearing and Stanley Walch handled the representation. The attorneys reviewed the drafts prepared by Vines and advised the buyers that the documents were one-sided and needed substantial revision.

On December 19, 1988 Steward, Goetz and Vines met at the offices of Thompson & Mitchell with the buyers and their attorneys to work out all of the open issues so that the documents could be prepared by closing. Kolb testified that Deborah Dearing said that the buyers wanted the guarantee changed from a "to the best of their knowledge" guarantee to an "absolute" guarantee of the accuracy of the financial statements. Steward testified that she did not hear Debo-rah Dearing make this statement. She and Kolb agreed that Goetz made a big scene and refused to guarantee the financial statements. Steward assumed the guarantee was still to the best of their knowledge. Steward testified that "they" asked her if she would be responsible for the financial statements and she said she would because she was still thinking the guarantee was "to the best of [her] knowledge." Steward stated, "I didn't have anything wrong with that. I had amended the tax return. We didn't have any wild fluctuations in inventory as far as I knew and I was happy." She also testified that Goetz told her the financial statements were her department and her responsibility and that she had prepared them and had to take charge of them. He told her there would probably be at the most $5,000.00 in taxes. Goetz said he was not going to guarantee anything. During the meeting, Steward agreed she would still be responsible for the financial statements. She knew Goetz would not be responsible for the financial statements. Steward testified she believed the financial statements were accurate to the best of her knowledge and agreed to be responsible for them to that extent. She testified, contrary to Kolb, that Kolb did not advise her at the meeting that she was now expected to give an absolute guarantee.

Steward testified that escrow was discussed in general terms as something Mercantile wanted, but no dollar amount was mentioned. Steward testified she knew Goetz would not put up any money.

Kolb testified that Goetz suggested postponing the closing until after the audit, but the buyers were adamant to close in December. He testified that if an audit had been conducted before closing which revealed a $292,199.00 deficit, he would have recommended that the transaction be renegotiated or that his clients walk away.

After the December 19 meeting, one of the Thompson & Mitchell attorneys prepared a draft of the agreements which provided that Steward would be solely responsible for the financial statements and sent it to Vines. Thompson & Mitchell also sent Vines revisions of the sales documents that included an escrow account to be set up by Steward to

cover any inventory deficiencies. Steward testified that she met with Vines and Goetz for three hours on December 20 to discuss the terms of the agreement. She was advised that closing for December 22 had been called off because the buyers were redoing the escrow provisions. She knew that the escrow was a significant part of what the buyers wanted. She testified she never saw any drafts of sales agreements prepared by Thompson & Mitchell or had any other communications with Vines until closing on December 28. Steward testified that on December 23 Goetz told her the closing was scheduled for noon on December 28. He told her they had decided on a $150,000.00 escrow to be withheld from her part of the proceeds. He told her that Mercantile wanted the escrow. She denied knowing that the escrow was being put up to guarantee the financial statements.

In a December 24, 1988 memorandum addressed to Dearing, Kolb, Goetz, Steward,[1] and the file, Vines stated that it was his understanding that the amount to be withheld from Steward's share of the redemption price related to a possible inventory shortage and suggested the amount withheld be placed in an interest bearing escrow account. He also stated that any increase in assets of the corporation resulting from an inventory overstatement should not be Steward's responsibility. He said he would check the $150,-000.00 amount with Steward and Goetz.

There was another meeting on December 27, 1988, the evening before the closing. Vines took notes at the meeting. His notes are headed "12/27/88—Conf. w/ Tom Barta, Deborah Dearing, Cliff Goetz." The first entry is: "Anne—inventory—$200-$225,000." At trial, on direct examination, Vines testified that these notes did not refer to an inventory shortage and that he did not know that there was an inventory shortage. Kolb testified that he was present for part of the meeting. He testified that there was no discussion of an actual inventory shortage of $200,000.00 to $225,000.00; that if there had been, this would have caused the buyers

alarm. He testified that no one told him that an inventory shortage had been discussed while he was out of the meeting. He testified that there was a last minute discussion of the amount the buyers wanted to go into escrow to cover the financial statements, including inventory, and that it was negotiated down to $150,000.00.

On direct examination at trial, Goetz testified that at the December 27 meeting one of the buyers, Barta, "wanted more money to be put up. He came back on the 27th and said that the bank wanted more money and Mr. Walch thought the guarantors wanted more money." Goetz testified that the discussion of $200,000.00–$225,000.00 was not about a shortage. Goetz testified that he told the buyers that they could not have Steward put up more money. In connection with the December 27 meeting, Steward's attorney questioned Goetz about the December 22, 1988 Thompson & Mitchell draft of the sale and purchase agreement. The draft stated that, with respect to the January 31, 1988 financial statements, there was "an inventory pricing extension error and certain other errors in the aggregate amount of approximately $270,000.00, previously disclosed to Buyers." Goetz testified that at the December 27, 1988 meeting he told Barta that in addition to this disclosed extension error, that there was a possibility of an inventory shortage of $25,000.00 to $50,000.00 for 1988.

On December 27 Goetz telephoned Steward and told her Mercantile wanted $150,-000.00 in escrow to be withheld from her part of the sales proceeds. Steward testified Goetz said, "Hell, Anne, the books are okay. Everything is fine" and that the escrow money would be coming back to her.

At the closing on December 28, 1988 Steward testified that Vines asked everyone to leave the room so he could talk to her. He showed her the intercreditor agreement between herself and Goetz and said, " 'Anne, this is your paragraph,['] and said, 'you have responsibilities for the financials,' and I said, 'Yes, okay.' He didn't tell me they had been changed. We went through. I saw a spell-

---

**1.** Vines did not specifically remember giving this memo to Steward, Steward was never asked if

she received it.

ing thing," and then he called the others back. The intercreditor agreement contains the following clause:

> 3. Indemnification. Steward acknowledges that she is solely responsible for certain indemnifications and warranties to [CBS] as they relate to taxes, financial matters, and inventory.

The word "solely" was misspelled and corrected. Steward initialed the correction.

Vines did not go through the sale and purchase agreement with her at closing. This document, as redrafted by the Thompson & Mitchell attorneys, provided that Steward represented and warranted the accuracy of the unaudited November 30, 1988 financial statements. It did not contain "best of her knowledge" language. However, Steward assumed she was only warranting those to the best of her knowledge. Steward based her assumption on the fact that the drafts she saw, which had been prepared by Vines prior to December 19, only contained guarantees that were to the best of her knowledge.

At closing, Steward also agreed to place $150,000.00 in escrow to cover any inventory deficiencies. The closing statement prepared by Vines shows the $150,000.00 deduction entitled "Escrow for inventory adjustment." Steward testified that she did not read any of the sales documents at closing because she trusted Goetz. Steward testified that no one told her not to read them. If she had read them, she would have understood them. After closing Steward paid Vines $6,000.00 for his legal fees.

On or about January 31, 1989 CBS was audited. The audit report showed the financial statements overstated the assets by $292,199.00. This overstatement included an inventory overstatement of approximately $280,000.00. The buyers retained the $150,-000.00 in escrow and Steward paid the buyers $142,199.00 to cover the difference.

Steward filed her first amended petition on August 20, 1993 seeking damages against Goetz for fraudulent and negligent misrepresentation and against Vines for legal malpractice. The case was tried to a jury. Steward testified at trial and called Robert Kolb, the buyers' accountant, and Peter Schmitz, an attorney, as her witnesses. She also called Vines and Goetz to testify as adverse witnesses. The jury returned a verdict in Steward's favor against Goetz for $146,000.00 in actual damages and $6,000.00 in punitive damages. The jury also returned a verdict against Vines for $5,500.00 in actual damages.

The trial court entered judgment on the verdicts. Steward filed a motion for prejudgment interest on the judgment against Goetz which the trial court denied. Goetz and Vines each filed motions for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court overruled Goetz's motion for JNOV but sustained his motion for a new trial on the grounds that the verdict directing instruction was erroneous. The court also sustained Vines's motion for JNOV and alternatively ruled that, if the JNOV was reversed, Vines should be awarded a new trial.

### ISSUES RELATING TO GOETZ

#### 1. *New Trial*

For her first point Steward asserts that the trial court erred in sustaining Goetz's motion for a new trial because Goetz did not preserve any assignment of error under Rule 70.03 because he failed to object to the instruction at the instruction conference and the giving of the instruction was not plain error under Rule 84.13. This point has no merit.

The trial court submitted an erroneous verdict director against Goetz in which the word "less" was used instead of the word "more." No objection was made to the instruction on this ground at trial. Steward claims that Goetz did not preserve any instructional error for the trial court because he did not specifically object as required by Rule 70.03 and the trial court could not consider the error in the instruction under the plain error rule. In this case plaintiff claims error because the trial court granted Goetz a new trial. There is a meaningful distinction between the denial of a new trial and the grant of a new trial. On appeal, when a party claims error because the trial court *denied* that party a new trial, the party

ordinarily must have made a proper and timely objection to the claimed error to preserve it for review; but, when, as here, a party claims error because the trial court *granted* the opposing party a new trial, the opposing party need not have made an objection to the error upon which the trial court granted a new trial. *Farley v. Johnny Londoff Chevrolet, Inc.*, 673 S.W.2d 800, 804 (Mo. App.1984). A trial court has the right, in the proper exercise of its discretionary power, to grant a new trial on account of any erroneous ruling, whether an objection has been made or not. *Beer v. Martel*, 332 Mo. 53, 55 S.W.2d 482, 485 (1932). *See* Rules 78.01 and 78.08.

■ The point relied on raises only a procedural challenge, failure to preserve an error. We do not review arguments which are not set out in the points relied on. *Landoll by Landoll v. Dovell*, 779 S.W.2d 621, 627 (Mo.App.1989). Because we are reversing the new trial order on other grounds, we will not review the trial court's new trial order for plain error. Point one is denied.

### 2. *Submissibility of Case Against Goetz*

■ Goetz argues that the trial court erred in not granting his motion for JNOV on the grounds that Steward did not make a submissible case. "[W]here a plaintiff appeals asserting error by the trial court, the defendant may contest the issue of submissibility of plaintiff's case, an issue inherent in every appeal." *Robbins v. Jewish Hospital of St. Louis*, 663 S.W.2d 341, 344 (Mo.App. 1983). If a plaintiff fails to make a submissible case, the new trial order must be reversed and the cause remanded for entry of a judgment notwithstanding the verdict. *Community Title v. Roosevelt Federal S & L*, 796 S.W.2d 369, 371 (Mo. banc 1990).

■ To make a submissible case, substantial evidence is required for every fact essential to liability. *Eidson v. Reproductive Health Services*, 863 S.W.2d 621, 626 (Mo. App.1993). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Center, Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985). The question of whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law. *Id.*

■ In determining whether a plaintiff has made a submissible case, we view the evidence in the light most favorable to that plaintiff. *Eidson*, 863 S.W.2d at 626. We presume the plaintiff's evidence to be true and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Id.* We disregard defendants' evidence that does not support the plaintiff's case. *Feely v. City of St. Louis*, 898 S.W.2d 708, 709 (Mo.App.1995). However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences. *Id.* The evidence and inferences must establish every element and not leave any issue to speculation. *Eidson*, 863 S.W.2d at 626.

■ A party is bound by the uncontradicted testimony of that party's own witnesses, including that elicited on cross-examination. *Id.; Hurlock*, 709 S.W.2d at 879. When a party calls a witness who comes within the adverse witness rule, the party is bound by that witness's testimony on direct examination if the testimony is uncontradicted or the only testimony on the subject; however, an adverse witness's testimony on cross-examination is not binding on the calling party. *Id.*

■ Facts necessary to sustain a recovery may be proved by circumstantial evidence; but the circumstances proven must be such that the facts necessary to support a verdict may be inferred and must reasonably follow, the existence of such facts may not depend upon guesswork, conjecture and speculation, and the evidence should have a tendency to exclude every reasonable conclusion other than the one desired. *Osterhaus v. Gladstone Hotel Corporation*, 344 S.W.2d 91, 94 (Mo.1961); Lappin v. Prebe, 345 Mo. 68, 131 S.W.2d 511, 513 (1939). A submissible case is not made if it solely depends on evidence which equally supports two inconsistent and contradictory factual inferences as to ultimate and determinative facts because liability is then left in the realm of

speculation, conjecture and surmise. *Eidson*, 863 S.W.2d at 626; *Hurlock*, 709 S.W.2d at 880.

Steward's theory of fraud, as it was meant to be submitted to the jury, was that Goetz knew or should have known that the inventory stated on CBS's books was more than the actual inventory at closing, that Goetz knew that Steward did not have this information, that the information relating to the inventory was material to Steward's decision to accept sole responsibility for the financial statements, and that Steward had a right to rely and did rely on Goetz to disclose the inventory information to her.

To establish fraud, a plaintiff must prove: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity, or ignorance of its truth; 5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) reliance by the hearer on the truth of the representation; 8) a right to rely thereon; and 9) consequent injury proximately caused to the hearer. *Eagle v. Swanger*, 787 S.W.2d 806, 809 (Mo.App.1990). The plaintiff bears the burden of establishing every element by substantial evidence. *Id.* The failure to establish any element defeats the cause of action. *Id.*

A duty to disclose information is imposed where "a classical fiduciary relationship exists, or, in an extension of that relationship, where a party expressly or by clear implication places a special confidence in the other." *Blaine v. J.E. Jones Const. Co.*, 841 S.W.2d 703, 705 (Mo.App.1992). This includes a relationship where one of the parties has superior knowledge not within the fair and reasonable reach of the other party. *Id.* The affirmative duty to disclose and the failure to do so is substituted for the false representation element required in a fraud action. *Id.*

Goetz argues Steward failed to make a submissible case of fraudulent failure to disclose a known inventory shortage. He asserts that she proved only that he had an opinion that there was a possible inventory shortage and that Steward failed to present evidence from which a jury could find that she either relied upon his non-disclosure of this opinion or had a right to rely on such non-disclosure. Goetz's argument is premised on the fact that Steward testified that (a) she knew that the actual inventory could only be determined through a physical count and (b) she knew that the company's records had materially misstated the inventory in each of the three prior years.

Steward argues that there was substantial direct evidence that Goetz knew of an inventory shortage in the range of $200,000.00 to $225,000.00 because Vines got his information about CBS from Goetz and Vines was aware of an inventory shortage as demonstrated by the following: 1) the December 24 memo prepared by Vines referred specifically to "a possible inventory shortage"; 2) Vines testified the reason the buyers wanted an escrow account was because of a possible inventory shortage; 3) Vines testified that he knew at the time he prepared the December 24 memo that there was a possible inventory shortage; 4) Vines admitted that after the December 19 meeting, the documents, all of which were closely reviewed by Goetz, began to focus on a possible inventory shortage; and 5) Vines's notes of the December 27 meeting indicate that they discussed a possible inventory shortage in the range of $200,000.00 to $225,000.00. Steward further argues Goetz's knowledge can be established by the facts that: 1) Goetz acknowledged that he was aware of a $25,000.00 to $50,000.00 shortage plus a $270,000.00 extension error, 2) Goetz refused to warrant the financial statements after the buyers requested an absolute guarantee, and 3) Goetz was at the business daily and department heads reported to him.

We must first examine these contentions against the record. In the December 24 memo Vines stated, "It is my understanding that the amount to be withheld from Anne Steward's share of the redemption price relates to a possible inventory shortage." Vines testified on direct examination that the buyers wanted an escrow account established because of a possible inventory shortage and that he and everyone else knew there was a possibility of an inventory shortage. His

notes of the December 27 meeting do not contain the word "shortage" and he testified on direct that his notes did not reflect a discussion of a possible inventory shortage in the $200,000.00—$225,000.00 range,[2] but a discussion of the amount of increased escrow the buyers were demanding. In his direct examination testimony Vines denied that he had any knowledge of an actual inventory shortage. Further, Steward adduced evidence from her own witness, Kolb, as well as Goetz, that the $200,000.00—$225,000.00 figure did not refer to an inventory shortage, but to the amount the buyers were asking be placed in escrow. Goetz did not acknowledge he was "aware of a $25,000.00 to $50,000.00 shortage"; only that he told Barta this was a possibility. The reference to a $270,000.00 extension error does not refer to an anticipated inventory shortage. Goetz was being questioned about Thompson & Mitchell's December 22 draft which stated that the sellers had disclosed a $270,000.00 extension error in the January 31, 1988 financial statements. Steward knew of the extension error and brought it up herself in the December 19 meeting.

There was no direct evidence that Goetz had obtained information that the inventory figures on the financial statements were substantially overstated or from which he should have known this. Further, there was no evidence from which this conclusion could be reasonably inferred. The fact that the buyers and sellers were discussing the possibility of an inventory shortage and that the buyers took measures to protect themselves against a shortage does not reasonably lead to the inference that Goetz knew or should have known of an actual inventory shortage, to the exclusion of other reasonable inferences. The discussion and concern can equally be explained by the fact that inventory was the main asset on the company's books and it was not being physically counted prior to closing.

Goetz's refusal to warrant the financial statements after the buyers demanded an absolute guarantee likewise does not reasonably lead to the conclusion that he knew of an inventory shortage to the exclusion of other reasonable inferences. His refusal equally supports the conclusion that he was exercising common sense in not guaranteeing the accuracy of financial statements where the major asset was inventory in a situation in which the inventory had not been physically counted and the inventory on the books historically had not been consistent with a physical count.

That Goetz was the chief executive officer and operating officer of CBS and that the department heads reported to him daily does not reasonably lead to the inference that he received information of an inventory shortage or from which he should have known of an inventory shortage. In the absence of any evidence that correct inventory figures existed at CBS, such a conclusion is purely speculative.

The entire spectrum of evidence binding on Steward supported equally inconsistent and contradictory inferences as to whether Goetz knew or should have known that there was in fact a substantial inventory shortage. Since she did not remove this issue from the area of speculation, conjecture, and surmise, Steward failed to make a submissible case on her submitted theory that Goetz had actual knowledge of an inventory shortage before closing or had facts available to him from which he should have known there was an inventory shortage. *See Hurlock,* 709 S.W.2d at 882.

**2.** Steward bases her claim that the persons at the December 27 meeting discussed a possible inventory shortage in the amount of $200,000.00 to $250,000.00 on a page from Vines's testimony in which Steward's attorney was reading and paraphrasing, without foundation or identification, portions of questions and answers from Vines's deposition and asking Vines to agree that the matter appeared in the question and/or answer. We interpret Vines's courtroom testimony on that page as confirming that he gave certain testimony in his deposition and not as a statement of his knowledge. After Vines's counsel subsequently objected, the trial court ruled that Steward's attorney had not been properly using the deposition. No foundation was laid for use of these portions of the deposition as impeachment or for admission as substantive evidence. These excerpts from Vines's deposition do not constitute evidence on which plaintiff can base a submissible case.

Steward proved only that Goetz and others believed there was a possibility of an inventory shortage. Steward did not show that Goetz's belief that an inventory shortage was possible was based on factual information not available to her or on facts different from those she already knew and therefore did not establish she relied or had a right to rely on Goetz's non-disclosure of this belief. Steward was treasurer of the company and received the monthly financial statements as well as communications about the inventory. She did not adduce any evidence that she was prohibited from obtaining any existing CBS financial information. Steward had information that the November 30, 1988 inventory was probably not accurate. She had been advised that $134,000.00 in windows did not appear on that inventory. She knew that there had been substantial discrepancies between inventory figures in CBS's two inventory accounting systems or between those figures and physical inventory counts during each of the three years prior to closing. She knew that the November inventory was not based on a physical count and she admitted that an actual physical count of the inventory was needed to get an accurate count. She was aware when she signed the guarantee at closing that, when the physical inventory would be taken a month or two later, there could be more or less inventory than appeared on the books. She knew that the buyers had requested that $150,000.00 be placed in escrow. Under these circumstances, Steward herself had information from which she could conclude that there was a possibility that the inventory on the books was less than what would show up on a physical count. Steward did not have the right to rely on Goetz to disclose that he believed an inventory shortage was possible. Accordingly, Steward did not make a submissible case on an actionable failure to disclose with reliance thereon.

Because Steward failed to make a submissible case, the new trial order must be reversed and the cause remanded for entry of judgment notwithstanding the verdict in Goetz's favor.

### 3. *Prejudgment Interest*

In her fourth point Steward claims the trial court erred in denying her motion for prejudgment interest on her judgment against Goetz in that the amount of damages was liquidated and she was entitled to prejudgment interest as a matter of law. In light of our disposition of the claim against Goetz, this point is moot.

### *ISSUES RELATING TO VINES*

### 1. *JNOV/Submissibility*

For her second point Steward asserts that the trial court erred in sustaining Vines's motion for judgment notwithstanding the verdict on the ground that the verdict was against the weight of the evidence because a JNOV may not be granted on this ground.

Vines concedes the JNOV was incorrectly granted on the ground that the verdict was against the weight of the evidence because this is not a proper ground on which a JNOV may be granted and this was not a ground raised in his motion. However, he argues that the JNOV in his favor should be affirmed because plaintiff did not make a submissible case of legal malpractice against him, a ground he did raise in his motion.

We will affirm a JNOV if it is supported by at least one of the grounds raised in the motion for JNOV. *Marshall Interiors v. Young Men's Ass'n*, 787 S.W.2d 329, 331 (Mo.App.1990). A contention that a JNOV was improperly entered raises the issue of whether the plaintiff made a submissible case. *Pikey v. Gen. Accident Ins. Co. of Amer.*, 922 S.W.2d 777, 780 (Mo.App.1996). The requirements and standard of review for submissibility have already been set out in this opinion.

To make a submissible case of legal malpractice, a plaintiff must prove: 1) that the lawyer was negligent in that he or she failed to exercise the degree of skill and diligence ordinarily used under the same or similar circumstances by members of the legal profession; 2) that the plaintiff sustained some loss or injury; and 3) a causal connection between the negligence and the loss. *London v. Weitzman*, 884 S.W.2d 674, 677 (Mo.App.1994).

Steward's theory of negligence as submitted to the jury was that either:

defendant Vines failed to advise plaintiff before the closing that he had knowledge that the Crestwood Builders Supply inventory was not accurate; or

defendant Vines changed the sale documents to shift sole responsibility for an inventory shortage to plaintiff and failed to tell her; or

defendant Vines failed to advise plaintiff that he had a material conflict of interest representing both plaintiff and defendant Goetz and that plaintiff should seek independent counsel to advise her before signing the sale documents;....

Vines challenges submissibility on several grounds. Vines first argues that Steward did not make a submissible case because she did not prove that Vines's conduct proximately caused Steward damage. We find this argument dispositive and therefore do not reach his other arguments.

In a legal malpractice case, negligence alone does not warrant a recovery for plaintiff; there must also be damage proximately resulting from an attorney's legal malpractice. *Lange v. Marshall*, 622 S.W.2d 237, 238 (Mo.App.1981). Where the evidence connecting the injury to the negligence amounts to mere conjecture and speculation, a contention that the plaintiff did not make a submissible case should be sustained. *Id.* The plaintiff has the burden to establish that the defendant's negligence proximately resulted in damages to the plaintiff. *Id.* To prove damages and causation the plaintiff must establish that, "but for" the attorney's negligence, the result of the underlying proceeding would have been different. *London*, 884 S.W.2d at 677. The measure of damage would be the amount a client would have received "but for" the attorney's negligence. R.E. Mallen and J.M. Smith, Legal Malpractice, Vol. II § 19.4 p. 602 (4th Ed.1996).

Steward alleged that as a result of Vines's negligence she was required to reimburse the buyers $292,199.00 for the inventory shortage. Steward testified that had she been fully informed, she would have refused to sign the guarantee of the financial statements and she would have refused to close. Steward's expert, Peter Schmitz, testified that Vines should have advised her to hire other counsel.

There was no evidence in the record that, had Vines done the things Steward contends he did not do, Steward would have been able to sell her share of CBS for $292,199.00 more than she did. There was no evidence in the record as to what new counsel would have advised Steward to do or how that advice would have allowed her to sell her interest in CBS at the agreed sale price without guaranteeing the financial statements or without having the sale price discounted for the missing inventory. Her legal expert testified that it would be a matter of speculation to say what would have happened had plaintiff retained independent counsel.

The evidence was uncontroverted that Goetz had refused to guarantee the financial statements notwithstanding the fact that the sale might not go through. Steward testified there was no doubt in her mind that Goetz was not going to guarantee the financial statements. Kolb testified that the buyers and their attorneys took the position that the buyers would not go through with the transaction unless the guarantees were given or an actual audit was conducted. Accordingly, if Steward had also refused to guarantee the financial statements, the sale would not have gone through. There was no evidence that CBS was worth the $5,000,000.00 purchase price or that another buyer would buy CBS for that price. In fact, Steward admitted that the $5,000,000.00 price was significantly higher than had been discussed with any other potential buyer.

Steward's witness, Kolb, testified that the buyers were adamant about closing in December and did not want the closing delayed. He testified Goetz was willing to delay closing until after an inventory was taken. If Steward would have been able to delay the closing date until after the inventory was counted, there was no evidence that her 50% of the sale price after adjustment for inventory would have been more than she actually received less the amount withheld and returned. Kolb testified that Steward "would have been worse off" if she waited until after

the audit to close the sale because the inventory shortage would have reduced the sale price of CBS by $1.5 million. Kolb testified that the buyers' purchase price was based on a "multiple of earnings" and, because the shortage affected earnings, this affected the overall price of CBS. He testified that if closing had been after the audit, he would have advised the buyers to renegotiate the transaction or walk away.

The fact that Goetz received more money than Steward did from the sale of CBS does not establish that she was damaged by Vines's alleged malpractice or that her damages were the difference between what Goetz received and what she received. Goetz refused to guarantee the financial statements on December 19; the buyers would not close without a guarantee. There is no evidence in the record that the buyers or Goetz would have backed off from their positions. Plaintiff was required to prove that, had Vines done something differently, she could have satisfied Goetz and the buyers and still have obtained the same amount of proceeds.

 Steward did not ask her expert witness, Peter Schmitz, to give an opinion on whether any of the three alleged acts of negligence proximately caused Steward to receive less money in the transaction. Expert testimony is generally required in legal malpractice claims except in a "clear and palpable" case. *Baldridge v. Lacks*, 883 S.W.2d 947, 954 (Mo.App.1994). This is not a "clear and palpable" case. The causal link was not obvious and was not established by other evidence. Expert testimony was accordingly necessary to show that, in view of Goetz's refusal to guarantee the financial statements and the buyers' demand for protection against an inventory shortage, the transaction could have been restructured in such a way that Steward could have still obtained the contracted purchase price. *See 2175 Lemoine Ave. v. Finco, Inc.*, 272 N.J.Super. 478, 640 A.2d 346, 353 (1994).

There is no evidence connecting the alleged injury to the alleged malpractice. Steward failed to establish any damages caused by Vines's alleged negligence and thus failed to make a submissible case against Vines. The trial court did not err in granting a JNOV in his favor. Point two is denied.

### 2. *New Trial*

Because we affirm the entry of a JNOV in Vines's favor, we need not address Steward's third point in which she challenges the trial court's alternative grant of a new trial.

### Conclusion

The trial court's judgment granting Goetz a new trial is reversed and the case remanded with instructions to enter a judgment notwithstanding the verdict in favor of defendant Clifford Goetz. The trial court's judgment notwithstanding the verdict in favor of defendant Leonard Vines is affirmed.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.