W.C. PARKER, et al., Plaintiffs/Appellants,

v.

**The SOUTH BROADWAY ATHLETIC CLUB, Defendant/Respondent.**

No. ED 88000.

Missouri Court of Appeals, Eastern District, Division Five.

Aug. 14, 2007.

Michael A. Gross, Joseph Fredric Yeckel, co-counsel, Theodore Hoffman, Steven Marc Gelfman, co-counsel, St. Louis, MO, for appellant.

Michael Bruce Maguire, Thomas Michael Ward, St. Louis, MO, for respondent.

BOOKER T. SHAW, Presiding Judge.

W.C. Parker and Martha Parker ("the Parkers"), parents of Curtis Parker ("Curtis"), appeal from the trial court's judgment entered upon the jury's verdict in favor of The South Broadway Athletic Club ("Club") on their wrongful death claim. We affirm.

In 2002, Curtis, who was twenty-eight years old, mentioned his interest in professional wrestling to his friend Cecil Lowe ("Lowe"), who is a professional wrestler. Lowe recommended to Curtis that he train at the Club, which has all the facilities necessary to train as a wrestler, including a gym, weights, wrestling ring and sauna. The wrestling activity that occurs in the Club is limited to "professional wrestling."[1] A number of professional wrestlers work out and practice at the Club. Some of these wrestlers offer to train individuals who are interested in learning professional wrestling. This is done on a volunteer basis, where the more experienced wrestlers assist the newer wrestlers learn the wrestling trade. Lowe brought Curtis to the Club where he met other wrestlers. Curtis began training at the Club. Several wrestlers, including Robert Harris ("Harris"), a member of the Club, began assisting Curtis. Harris became a professional wrestler in 1996 and has a professional wrestler's license from the State of Missouri. After Harris was involved with professional wrestling for about four years, he volunteered to assist

1. Professional wrestling, unlike scholastic wrestling, is scripted, "like a soap opera."

others in learning how to become professional wrestlers.

The first series of lessons Curtis received were devoted to teaching Curtis "bumps," or "how to . . . fall without injuring [himself.]"[2] After mastering bumps, a new wrestler learns how to perform holds and moves. The final set of lessons focus on teaching new wrestlers "how to put all these moves together for matches."

Curtis went to the Club for training several times that summer. During the fourth lesson, on July 16, 2002, Curtis said that "his head was hurting him pretty bad," and Harris told Curtis to "get out of the ring, sit down."

Curtis's fifth lesson was on Monday, July 22, 2002. When Curtis arrived at the Club, Harris asked him, "[H]ow are you feeling, kid[?]" Curtis replied, "Well, it took me forever to get rid of my headache. I took all kinds of Tylenols, Ibuprofens and everything. It finally went away after four or five days." Harris then asked him "[H]ow [are] you feeling now[?]", and Curtis responded, "I'm feeling great." Relying on Curtis's repeated assurances, and noting that Curtis "looked normal and . . . talked normal," Curtis was admitted back into the wrestling ring. Harris started the lesson by performing a bump on Curtis called a "six pack."[3]

The final bump Curtis had to master was a "power bomb." To deliver a power bomb, a wrestler lifts his opponent to chest or shoulder height and drops him to the mat on his back. First, Harris showed Curtis the move with other wrestlers. Then, Harris performed the move on Curtis two times while cradling him the entire way down to the mat. The third power bomb involved a full release—Harris hoisted Curtis up and "just let him go." Curtis "free [fell] all the way down on his back." Harris noted that Curtis "landed perfectly."

Curtis sat up after striking the mat. Harris congratulated him and told Curtis that he was ready to advance to moves. Curtis turned around and "his eyes rolled up in his head." He went into a seizure and started "shaking ferociously" and foam and blood began to trickle out of his mouth. An ambulance transported Curtis to St. Louis University Hospital where he died nine days later.

The Parkers filed a wrongful death lawsuit in the Circuit Court of the City of St. Louis against the Club and Harris.[4] The Parkers alleged that the Club failed to exercise reasonable care in not requiring Curtis to obtain medical clearance before allowing him to resume his wrestling lessons.

Dr. Mary Case, a board certified forensic pathologist and forensic neuropathologist, testified on behalf of the Parkers. Dr. Case reviewed the events preceding Curtis's injury and concluded that Curtis's death was caused by a subdural hemorrhage resulting from second-impact syndrome. Dr. Case testified that individuals who experience a second concussion before fully recovering from a prior concussion are susceptible to second-impact syndrome, which is characterized by very rapid brain swelling. Dr. Case opined, after

**2.** Harris described a "bump" as "I reach over. I put my arm underneath your groin. My other arm is on the back of your neck. I pick you up upside down like this, and I slam you down on the ground."

**3.** A "six pack" is: when you're on the top rope, you get punched in the stomach, one hand goes up

in the groin, one hand goes on the upper part of your chest[.] [Y]ou launch them into the air, they do a somersault in the air and land on their back.

**4.** The Parkers reached a settlement with Harris before the case was submitted to the jury.

reviewing all of the historical information, that because Curtis's headaches followed some of his wrestling moves, he suffered from second-impact syndrome. Dr. Case explained that the second-impact syndrome is undetectable in an autopsy. She testified that the analgesic medication Curtis took for his headaches masked the symptom of his headache, but that he was still symptomatic when he returned to the Club for wrestling lessons.

On cross-examination, Dr. Case testified that there are many kinds of headaches, and that "you don't have to have a concussion to get a headache." She testified that while headaches are a symptom of a concussion, there are many others, including, dizziness, nausea, vomiting, lack of awareness of your surroundings, and being easily fatigued. In this case, other than complaining of a headache, Curtis did not have any other concussive symptoms. Dr. Case also testified that even if Curtis had gone to see a physician complaining of headaches and had a CT scan or an MRI of his brain, those procedures would not have revealed that Curtis had a concussion. On the other hand, Dr. Case testified that a PET scan would have shown this damage to his brain, but "[t]here would be no possibility that [Curtis] was going to get a PET scan." Finally, Dr. Case testified that a regular physical examination "might not pick up signs of a concussion, without trying to elicit certain types of symptoms or signs."

At the instruction conference, the Parkers' counsel requested that the case be submitted on comparative fault principles. Although the Club raised comparative fault as an affirmative defense in its answer, the jury instructions it submitted omitted comparative fault. The trial court declared that "[t]his is not a comparative fault case" and announced that it would not instruct the jury to apportion fault among the parties.

The Club tendered an instruction based on its affirmative defense of assumption of the risk. The Parkers' counsel objected that the instruction failed to identify the risk that had to have been assumed or to require that Curtis appreciated that particular risk, and therefore, it gave the jury a roving commission. The trial court overruled the objections and gave the assumption of the risk instruction to the jury.

The jury returned a verdict in favor of the Club and the trial court entered a judgment on that verdict. After the trial court denied their motion for new trial, the Parkers appealed.

In their first point on appeal, the Parkers argue the trial court erred in overruling their objections to Instruction No. 7 and in giving Instruction No. 7 to the jury because that instruction misstated the law of assumption of the risk and provided the jury with a roving commission. In their second point on appeal, the Parkers argue the trial court erred in refusing to instruct the jury on comparative fault because the Club pled comparative fault as an affirmative defense and there was substantial evidence to support a finding that Curtis's negligence contributed to his injury. Even though these jury instructions may be erroneous, we affirm the trial court's judgment because the Parkers failed to make a submissible case.

◼ In its brief, the Club specifically argues the Parkers failed to make a submissible case because they did not establish that the Club knew or should have known that Curtis sustained a concussion on July 16, 2002. We agree.

Before reversal and remand for a new trial, the Court must consider whether the Parkers made a submissible case against the Club. *Eidson v. Reproductive Health Servs.*, 863 S.W.2d 621, 626 (Mo.App. E.D. 1993). If the Parkers failed to make a

submissible case, any instructional error is deemed harmless. *Id.*

To make a submissible case, the Parkers bear the burden of establishing by substantial evidence every element of their claim and every fact essential to liability. *Steward v. Goetz,* 945 S.W.2d 520, 528 (Mo.App. E.D.1997). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Id.* The failure to establish any element or essential fact defeats their claim. *Id.*

In determining whether the Parkers made a submissible case, the Court views the evidence in the light most favorable to them, giving them the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Id.* However, the Court does not supply missing evidence or give them the benefit of unreasonable, speculative, or forced inferences. *Id.* "The evidence and inferences must establish every element and not leave any issue to speculation." *Id.*

Whether the Parkers made a submissible case is a question of law for the Court to decide. *Id.* "The question of whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law." *Id.*

When the record before us is examined in this light, we find the Parkers failed to make a submissible case against the Club. As submitted in the trial court's verdict-directing instruction,[5] the Parkers' claim depended on two essential issues. First, the Club knew or should have known that Curtis had sustained a concussion on July 16, 2002. Second, the Club had a duty to bar him from returning to wrestling activity absent an examination of his physical condition by a medical doctor. Because we find the Parkers did not satisfy the first essential element of their case, we hold they failed to make a submissible case and the trial court's judgment in favor of the Club should be affirmed.

The Parkers submitted their case on a theory that Curtis's death resulted from the second-impact syndrome. However, we do not find substantial evidence in the record to prove that the Club knew or should have known that Curtis had sustained a concussion on July 16, 2002.

Here, Harris was only aware that Curtis had a headache of unknown cause and origin that had resolved itself before Curtis returned to the Club for additional wrestling training on July 22, 2002. When Curtis returned to the Club to resume his wrestling activity on that day, Curtis looked and talked normally, and told Harris he was feeling great. Dr. Case opined that Curtis sustained a concussion prior to his symptoms on July 22, 2002, and his resulting death. However, substantial evidence was not presented at trial that the Club knew or should have known that Curtis had sustained a concussion.

---

5. The verdict directing instruction stated:

On [the Parkers'] claim against [the Club], your verdict must be for [the Parkers] if you believe:

First, [the Parkers] were [Curtis's] natural mother and father, and

Second, that [Curtis] sustained a concussion on Tuesday, July 16, 2002, and

Third, that [the Club] knew or should have known that decedent [Curtis] has sustained a concussion, and

Fourth, that [the Club] permitted [Curtis] to return to wrestling activity without an examination of his physical condition by a medical doctor, and

Fifth, that [the Club] was thereby negligent, and

Sixth, as a direct result of such negligence [Curtis] died,

unless you believe [the Parkers] are not entitled to recover by reason of Instruction Number 7.

Dr. Case testified that "you don't have to have a concussion to get a headache." She testified that while headaches are a symptom of a concussion, there are many others, including, dizziness, nausea, vomiting, lack of awareness of your surroundings, and being easily fatigued. In this case, other than complaining of a headache, Curtis did not have any other concussive symptoms. Dr. Case also testified that a CT scan or an MRI of Curtis's brain would not have revealed that Curtis had a concussion. On the other hand, Dr. Case testified that a PET scan would have shown this damage to his brain, but "[t]here would be no possibility that [Curtis] was going to get a PET scan." Dr. Case further testified that a regular physical examination "might not pick up signs of a concussion, without trying to elicit certain types of symptoms or signs."

Under these circumstances, we find the Parkers failed to prove that the Club knew or should have known that Curtis had sustained a concussion on July 16, 2002. If it would have been difficult for a doctor to diagnose an initial concussion without recourse to sophisticated diagnostic tests, the Club certainly could not have known that Curtis had sustained a prior, unhealed concussion solely based upon his complaint of having a headache. As such, the Parkers failed to make a submissible case against the Club.

The trial court's judgment in favor of the Club is affirmed.

AFFIRMED.

KATHIANNE KNAUP CRANE and LAWRENCE E. MOONEY, JJ., concur.