**Jana KIVLAND and Kristin K. Bold, Appellants,**

**v.**

**COLUMBIA ORTHOPAEDIC GROUP, LLP, and Robert Gaines, M.D., Respondents.**

**No. SC 90708.**

Supreme Court of Missouri, En Banc.

Jan. 25, 2011.

Thomas K. Neill, Stephen R. Woodley, Joan M. Lockwood, Gray, Ritter & Graham PC, St. Louis, for the Kivlands.

Kevin F. O'Malley, Theodore D. Agniel, Marcus C. Wilburs, Greensfelder, Hemker & Gale PC, St. Louis, for Gaines and the Orthopaedic Group.

MICHAEL A. WOLFF, Judge.

### Introduction

After Dr. Robert Gaines performed surgery on Gerald Kivland's spine in January 2005, Kivland allegedly was paralyzed from the waist down and suffered continuous and extreme pain in the paralyzed region. He sued Dr. Gaines and his employer, Columbia Orthopaedic Group LLP (collectively "Dr. Gaines") in July 2005 for medical negligence, seeking damages for injury, disability and suffering; his wife, Jana Kivland, sued for damages for loss of consortium. Because the case comes before this Court before there has been a trial, it is important to note that the statements about the surgery and its aftermath are allegations and medical opinions—the facts are yet to be proved.

Eight months after filing the medical negligence suit, Gerald Kivland committed suicide.

■ After Gerald Kivland's death, the medical negligence action was amended by adding a claim for wrongful death on behalf of his widow and his daughter, Kristin Bold (collectively "the Kivlands"). The lawsuit, as amended after Gerald Kivland's death, in effect has two separate claims:

(1) A claim under the wrongful death statute that Gerald Kivland's death was a direct result of Dr. Gaines' negligence. If this wrongful death claim is viable, Gerald Kivland's claim for damages for his injury, disability and suffering that he possessed at the time of his death are merged into the wrongful death claim as well as his wife's claim for loss of consortium. Kivland's widow and daughter are proper claimants under the wrongful death statute.[1] Section 537.080, RSMo 2000.[2]

(2) Dr. Gaines' negligence caused Gerald Kivland's injury, disability and pain—but was not a cause of his death. If there is no viable claim that Dr. Gaines' negligence caused Gerald Kivland's death, this "survivor" claim is one that Kivland had at the time of his death that passed to his estate.[3] Section 537.020. Recov-

---

1. Jana Kivland, as plaintiff *ad litem* and personal representative of Gerald Kivland's estate, also brought a claim for lost chance of survival, which, in essence, duplicates the wrongful death claim.

2. All statutory references are to RSMo 2000 unless otherwise indicated.

3. *See Wollen v. DePaul Health Center*, 828 S.W.2d 681, 685 (Mo. banc 1992) ("The language of the survivorship statute and the wrongful death statute are mutually antagonistic. The survivorship statute applies when the injury alleged did *not* cause death, and the wrongful death statute applies when the injury did cause death.").

ery on this claim properly is pursued by Jana Kivland, as representative of the estate. Section 537.021. She also would remain a plaintiff for loss of consortium incurred prior to her husband's death.[4]

Dr. Gaines first moved to strike the Kivlands' expert witness, whose opinion was that Gerald Kivland's death was a direct result of the pain from surgery. The circuit court granted the motion to strike the expert witness. The circuit court then granted Dr. Gaines' motion for partial summary judgment on the wrongful death claim. The partial summary judgment was designated as final for purposes of appeal under Rule 74.01(b).

The order granting summary judgment on the wrongful death claim disposes of a distinct claim for relief—the Kivlands' separate claim for wrongful death described in paragraph (1) above—and, on the circuit court's certification, it was final for purposes of appeal. Rule 74.01(b). The "survivor" claim on behalf of Gerald Kivland's estate, described in paragraph (2) above, remains pending in the circuit court.

The question presented in this appeal is whether suicide is an intervening cause of Kivland's death, unrelated to Dr. Gaines' alleged negligence as a matter of law, rendering irrelevant any expert testimony that the death was caused by post-surgical pain.

## Facts and Procedural Posture

Dr. Gaines performed surgery on Gerald Kivland to correct a curvature of Kivland's spine in January 2005. Following surgery, Kivland was paralyzed from the waist down and suffered intense and continuous pain in the paralyzed region. Specifically, Kivland's suit alleges that his pain originated in his hips and tightened around his testicular area, that he felt a burning sensation in his legs and that the pain was so acute that it hurt to have a sheet touch his legs.

Kivland was prescribed several medications to combat the pain. When these medications failed to allay the pain, doctors surgically implanted a morphine pump, which also was unsuccessful at alleviating his pain. During this time, Kivland also was prescribed Wellbutrin, an antidepressant, to help him sleep and to treat his arthritis, and was placed on two anti-anxiety medications.

Before his death in March 2006, Kivland purchased a gun and ammunition and wrote farewell letters to his wife and daughter. The morning of his death, he spoke to his wife regarding his meal and medication, and he congratulated his daughter for obtaining a new job. He then wheeled himself out of his condominium, with a blanket covering his lap to hide the gun, and killed himself.

Kivland's personal injury lawsuit subsequently was amended to add the wrongful death claim of his widow and daughter and to name his widow, as representative of his estate, on the lost chance of survival claim. Dr. Gaines' motion for partial summary judgment on these two claims—for wrongful death and lost chance of recovery—asserted that Kivland's suicide was an independent intervening act and that, as a

---

4. A wrongful death claim "does not include damages incurred by a surviving spouse for loss of consortium after injury but prior to death." *Bridges v. Van Enterprises*, 992 S.W.2d 322, 326 (Mo.App.1999). A wrongful death claim does include such damages as "the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained had death not ensued." Section 537.090. The spouse's claim for wrongful death specifically includes damages for loss of consortium. *Id.*

matter of law, Dr. Gaines legally could not be responsible for his death. This first motion for partial summary judgment was overruled.

Dr. Michael Jarvis, the chief medical director of inpatient psychiatry at Barnes–Jewish Hospital in St. Louis, retained as an expert by the Kivlands, then testified in a deposition that Gerald Kivland's suicide resulted from the pain caused by the surgery, that Kivland's suicide was not based on a rational choice and, therefore, that the suicide was not "voluntary."

After Dr. Jarvis' deposition, the circuit court sustained Dr. Gaines' motion to strike Dr. Jarvis as an expert witness. The court ruled that Dr. Jarvis would be precluded from testifying at trial as to issues relating to the cause of Gerald Kivland's suicide. Dr. Gaines then renewed his motion for partial summary judgment, which the circuit court granted. The court certified the judgment for appeal. Following an opinion in the court of appeals on the Kivlands' appeal, this Court granted transfer.

Dr. Gaines filed a motion with this Court, arguing the Court does not have appellate jurisdiction because the dismissal of the Kivlands' claims for lost chance of survival and wrongful death on partial summary judgment does not dispose of separate claims under Rule 74.01(b).[5] These claims relate only to the separate claim for wrongful death, however, which alleges that the negligence of Dr. Gaines caused Gerald Kivland's death. The circuit court's order, therefore, disposed of separate, distinct claims. This Court has

jurisdiction to review the circuit court's order granting partial summary judgment to Dr. Gaines. Mo. Const. art. V, sec. 10.

## Standard of Review

■■■■ This Court's review of a grant of summary judgment is essentially *de novo*. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The Court reviews the whole record in the light most favorable to the non-moving party. *Id.* See also *Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 85 (Mo. App.1999) ("As an appellate court, we are confined to considering the same information that the trial court considered in rendering its decision on the motion for summary judgment."). The non-moving party is to be given the benefit of all reasonable inferences. *ITT Commercial Finance Corp.*, 854 S.W.2d at 376. "[A]ny evidence in the record that presents a genuine dispute as to the material facts defeats the movant's prima facie showing." *Id.* at 382. Summary judgment is, therefore, only proper when the moving party has demonstrated that there is no genuine issue of material fact such that judgment is proper as a matter of law. *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. banc 2009).

## Lost Chance of Survival

The Kivlands' claim for lost chance of survival could be resolved on a motion to dismiss for failure to state a claim by not considering the evidentiary material a court examines in converting a motion to dismiss to a motion for summary judg-

---

5. Rule 74.01(b) provides that "[w]hen more than one claim for relief is presented in an action ..., the court may enter a judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay." Cf. *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997) (holding that so long as there are "'differing,' 'separate,' 'distinct' transactions or occurrences that present a separately appealable judgment," a distinct judicial unit exists) (quoting *Weir v. Brune*, 364 Mo. 415, 262 S.W.2d 597, 600 (1953)).

ment. Rule 55.27(a).[6] The Kivlands' claim for lost chance of survival alleges nearly the same facts as their wrongful death claim. There are only two minor differences between the allegations. The lost chance of survival claim is filed on behalf of Jana Kivland, as plaintiff *ad litem* and personal representative of the estate of Gerald Kivland, whereas the wrongful death claim is on behalf of Jana Kivland and Kristin Bold, as claimants under the wrongful death statute, section 537.080. The lost chance of survival claim contains one additional allegation that is not contained within the wrongful death claim—that "[a]s a direct and proximate result of the negligence and carelessness of defendants ... Gerald Kivland lost a substantial chance of recovery, and as such, plaintiff Jana Kivland is entitled to damages for said loss under [section] 537.021."

■ The purpose of a lost chance of recovery or survival claim is to address the harm that a patient suffers "when the doctor fails to diagnose or adequately treat a serious injury or disease." *Wollen*, 828 S.W.2d at 686. In *Wollen*, the decedent went to the defendant doctors for medical treatment. The doctors failed to diagnose him with anything, and he subsequently died. If the doctors had performed appropriate tests or had interpreted correctly the tests they did conduct, they would have diagnosed the decedent with gastric cancer. If he had received this diagnosis and had been given appropriate treatment, he would have had a 30 percent chance of survival. *Id.* at 681–82. In *Wollen*, the Court recognized a lost chance of survival

or recovery claim. The Court said that the claim should be used when "it is impossible for a medical expert to state with 'reasonable medical certainty' the effect of the failure to diagnose [or treat] on a specific patient, other than the fact that the failure to diagnose eliminated whatever chance the patient would have had." *Id.* at 682. The Court recognized that this claim was necessary, given that the plaintiff had no claim for wrongful death, because "it [was] impossible to prove that decedent's death resulted from the failure to properly diagnose and treat." *Id.* at 686.

■ The causation requirements for wrongful death and lost chance of survival are different: "In wrongful death actions, plaintiffs must establish that, but for the defendant's actions or inactions, the patient would not have died." *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. banc 2008). For a lost chance of recovery or survival claim, however, "it is impossible to establish the patient would have recovered or survived but for the defendant's alleged failure to properly diagnose or treat." *Markham v. Fajatin*, 325 S.W.3d 455, 460 (Mo.App.2010) (citing *Wollen*, 828 S.W.2d at 685).

■ In this case, the Kivlands' lost chance of survival claim is simply a reassertion of their wrongful death claim. No facts were alleged that show it is impossible to establish that Kivland died as a result of the defendants' negligence; instead, the lost chance of survival claim simply reasserts that, but for Dr. Gaines'

6. Rule 55.27(a) provides in pertinent part:
. . .
If, on a motion asserting the defense ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the mo-

tion shall be treated as one for summary judgment and disposed of as provided in Rule 74.04. All parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 74.04.

negligence, Gerald Kivland would not have died. This is the same thing as claiming that Dr. Gaines' negligence caused Kivland's death.

The claim for lost chance of survival does not survive Gerald Kivland's death. Whether on a motion to dismiss for failure to state a claim or a motion for summary judgment, the claim was disposed of correctly.

### Wrongful Death

■ The circuit court granted summary judgment after determining that the Kivlands had not shown that a genuine issue of material fact existed as to the causation element of their wrongful death claim. In opposition to Dr. Gaines' motion for summary judgment, the Kivlands relied on an affidavit and on the deposition testimony of their expert, Dr. Jarvis.[7] Before analyzing whether Dr. Jarvis' testimony showed a genuine issue of material fact, it is necessary to outline the proper standard for determining when a negligent defen-

dant may be held liable for a decedent's suicide in Missouri.

If suicide as a matter of law negates a claim that Kivland's death was caused by Dr. Gaines' medical negligence, then expert testimony that his suicide was the result of unbearable post-surgical pain is irrelevant.

■ To show causation in any wrongful death case, a plaintiff must show that the negligence of the defendant "directly cause[d]" or "directly contribute[d] to cause" the patient's death. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993). More than 40 years ago in *Wallace v. Bounds*, 369 S.W.2d 138 (Mo.1963), this Court ruled on an appeal where the trial court refused to submit a plaintiff's claims both that (1) the decedent's personal injuries were the result of the negligence of the defendant automobile driver and that (2) the injuries the decedent suffered in the accident caused his suicide.[8] Plaintiff elected the theory that decedent's death by suicide

7. Dr. Gaines argues that this Court lacks "jurisdiction" to review the expert's testimony because the order striking Dr. Jarvis as an expert was certified as final for purposes of appeal under Rule 74, and, in the absence of an appeal, there was no expert evidence before the circuit court. Accordingly, Dr. Gaines argues, summary judgment was proper because the Kivlands had no expert testimony as to causation. As noted, however, this Court reviews the whole record in deciding whether summary judgment was granted correctly. *ITT Commercial Finance Corp.*, 854 S.W.2d at 376. In this case, Dr. Jarvis' affidavit and deposition testimony were before the circuit court on summary judgment. The circuit court's order granting the motion to strike was an evidentiary ruling on the admissibility of Dr. Jarvis' testimony. As such, the evidence was before the circuit court, and this Court can consider Dr. Jarvis' testimony.

8. The wrongful death statute was different at the time of *Wallace*. The wrongful death stat-

ute cited in *Wallace*, section 537.080, RSMo 1959, allowed the "administrator or executor of the deceased" to recover if the decedent was an adult and there was no husband, wife or child to recover. In *Wallace*, the administrator was also the personal representative of the estate under the survival action. *See* section 537.020, RSMo 1959. Because this person was the same person in *Wallace*, the theories factually disproved each other and required election. *Whittom v. Alexander–Richardson P'ship*, 851 S.W.2d 504, 508 (Mo. banc 1993). If, however, theories are not inconsistent "in all circumstances," both may be submitted to the jury. *Id.* A single plaintiff no longer can bring both a survival action and a wrongful death action as in *Wallace*. Section 537.080 since has been amended to allow only the heirs of the deceased or an appointed plaintiff *ad litem* to bring suit under the wrongful death statute. *In re Estate of Daly*, 907 S.W.2d 200, 203 n. 2 (Mo.App. 1995).

was the result of the injuries suffered in the accident. *Id.* at 140. This Court upheld the trial court's jury instruction that required the plaintiff to prove that the decedent's suicide was "the direct and proximate result" of the injuries caused by the defendant's negligence. *Id.* at 143–44. The jury's verdict was for the defendant. In the course of the opinion, in *dicta*, the Court quoted a C.J.S. treatise that seems to take two positions that reflect results in different cases. The cases reflected in the treatise are not necessarily consistent with each other: (1) that when an injury produces "mental torture," and the act of suicide of the insane person is "voluntary," there is no recovery; and (2) that when as the result of the injury, "the person becomes insane and bereft of reason," and his act is "involuntary," the injury "has been held to be the proximate cause of death." *Wallace*, 369 S.W.2d at 143–44.[9]

Since *Wallace* was decided, this Court has not had the opportunity to apply or refine these *dicta*, but the court of appeals and federal courts interpreting Missouri law have attempted to discern the law on this point.[10] In *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 473 (8th Cir. 1987), the Eighth Circuit cited *Wallace* for the proposition that "[u]nder Missouri law, when a person's actions cause a victim to become 'insane and bereft of reason' such that the victim involuntarily commits suicide, the person's actions can constitute the proximate cause of the death." The court noted that an "irresistible impulse" was one form of insanity that could lead to an involuntary suicide. *Id.*

In *Eidson v. Reprod. Health Servs.*, 863 S.W.2d 621, 627 (Mo.App.1993), the court of appeals said that *Wallace* stood for the rule that "[w]here the injury is .death caused by a voluntary suicide, the suicide is considered a new and independent intervening act which breaks the causal connection between the allegedly negligent act and the death." But *Wallace* did authorize a court to hold a defendant liable for a decedent's suicidal death where:

(1) insanity prevents the injured party from understanding what he or she is

---

9. The full quote is:

Suicide due to a mind disordered by an accident or injury or even by an assault accompanied by mental torture, has been held not so related to the wrongful acts as to furnish a ground for the action, where the act of suicide of the insane person is voluntary and done with the knowledge of its purpose and physical effect; but where, as the proximate result of the injury the person becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life, his act being involuntary, the act causing the injury has been held to be the proximate cause of death.

*Wallace*, 369 S.W.2d at 143–44 (citing 25 C.J.S. Death, section 25).

10. The problem with a variously worded explanation, such as the C.J.S treatise paragraph set out in *Wallace*, is demonstrated by two separate ALR annotations, each cherrypicking from *Wallace* to cite it for a different proposition. Although the propositions are not necessarily inconsistent with each other, only citing one without the other leaves the reader with an incomplete picture of what Missouri law is, and neither seems entirely accurate. *Compare* C.T. Drechsler, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 (2010) (citing *Wallace* as the Missouri case for the general rule that "where injuries resulting from the negligence of a third person produce a state of mind in the injured person which leads to his suicide, the person guilty of the negligence is not civilly responsible for the suicide"), *with* Gregory G. Sarno, *Liability of One Causing Physical Injuries as a Result of Which Injured Party Attempts or Commits Suicide*, 77 A.L.R. 311 (2010) (citing *Wallace* as the Missouri case expressly citing the rule from the Restatement (Second) of Torts, section 455, as requiring a person's suicide to be the result of an irresistible impulse or because he or she did not understand the nature of his or her actions).

doing or from understanding its inevitable or probable consequences or (2) the injured party's act is done under an insane impulse which is irresistible because the insanity has prevented his or her reason from controlling his or her actions. The evidence must also establish that the decedent committed suicide while so insane.

*Id.* at 627.[11]

The cases interpreting *Wallace* have tried (and failed) to articulate a clear standard for determining when a negligent defendant can be held responsible for a decedent's suicide. The cases have focused on two concepts to show that the negligent tortfeasor caused the decedent to commit suicide: (1) the decedent was "insane" in some sense and (2) as·a result of this "insanity," the decedent "involuntarily" committed suicide. The courts have found that when a person commits suicide as a result of an irresistible impulse, as demonstrated by the person's inability to control his actions by reason, or because he or she did not understand the nature of his or her actions, the person is "insane."

Dr. Gaines argues that for a decedent to commit his suicide in response to an irresistible impulse, the decedent must have been suffering from a diagnosed mental disorder or mental illness of some sort.

Although other states have required such a diagnosis, no Missouri case ever explicitly has required that the decedent be diagnosed with a specific mental disorder.

Other courts have weighed in on this question. "[T]he more recent trend [and better rule] is to place less emphasis on the mental state and more on the causal connection." *Halko v. New Jersey Transit Rail Operations, Inc.*, 677 F.Supp. 135, 142 (S.D.N.Y.1987) (citing *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960); *Zygmaniak v. Kawasaki Motors Corp. U.S.A.*, 131 N.J.Super. 403, 330 A.2d 56 (1974); *Fuller v. Preis*, 35 N.Y.2d 425, 363 N.Y.S.2d 568, 322 N.E.2d 263 (1974)). In *Fuller*, the New York Court of Appeals noted in *dictum* that "recovery for negligence leading to the victim's death by suicide should perhaps, in some circumstances, be had even absent proof of a specific mental disease or even an irresistible impulse provided there is significant causal connection [between the injury and the suicide]." *Fuller*, 363 N.Y.S.2d 568, 322 N.E.2d at 266.

Modern psychiatry supports the idea that suicide sometimes is a foreseeable result of traumatic injuries.[12] *See* Allen C. Schlinsog, Jr., *The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased*, 24 J. MARSHALL L.REV. 463, 479, n.

---

11. Although the *Eidson* court cited *Wallace* as the controlling law in this state, the court in *Eidson* derived its standard from the Restatement (Second) of Torts, section 455 (1965). *Eidson*, 863 S.W.2d at 627. Although this Court cited section 455 in *Wallace*, it never explicitly has endorsed this standard. The Court in *Wallace* only listed the Restatement in a long *"see also"* string cite following its C.J.S. treatise citation. *See Wallace*, 369 S.W.2d at 144.

12. Researchers also have looked at just people with spinal cord injuries, like Gerald Kivland, and determined that they have a greater chance of suicide as well. *See* S.W. Clarified

and K.A. Gerhard, *Behavioral and Demographic Predictors of Suicide After Traumatic Spinal Cord Injury*, 72 ARCH. PHYS. MED. REHAB. 488 (1991) (finding that death by suicide is two to six times more prevalent than in the general population). One study even has found that marginally-disabled individuals such as Gerald Kivland have a rate of suicide twice as high as those individuals who are paralyzed in all four limbs or the whole body below the neck. A. Hardtop et al., *Suicide in a Spinal Cord Injured Population: Its Relation to Functional Status*, 79 ARCH. PHYS. MED. REHAB. 1356 (1998).

76 (1991) (citing various studies). *See also* Gabriel Ryb E., M.D. et al., *Longitudinal Study of Suicide After Traumatic Injury*, 61 J. Trauma 799 (2006) (finding that suicide is more common for trauma patients than for the general population, particularly with increased age, for white male trauma patients, for trauma patients having a positive alcohol toxicology and for trauma patients suffering from disability resulting from the trauma).

Missouri's causation standard in a wrongful death case is that the decedent's death was "a direct result" of a defendant's negligence. MAI 20.01, 20.02. Dr. Gaines asks this Court to make a general exception to the causation standard when the death is by suicide, but the exception does not hold up well under careful analysis.

When suicide occurs, must the plaintiff show that the decedent was "insane" and acting as a result of an "irresistible impulse" at the time of his or her suicide in order to provide the causal link to a defendant's negligence? The problem with such a test readily is demonstrated by the various ways in which courts have defined an "irresistible impulse." Some cases have found that "[a]n irresistible impulse does not necessarily mean a sudden impulse." *Fuller*, 363 N.Y.S.2d 568, 322 N.E.2d at 268; *see also R.D. v. W.H.*, 875 P.2d 26, 29 (Wyo.1994) (holding the same). In *Fuller*, the court held that a jury could find the existence of an irresistible impulse even though the decedent had planned his suicide. *Fuller*, 363 N.Y.S.2d 568, 322 N.E.2d at 268. The decedent in *Fuller* had written suicide notes, changed his will two days before his death and acquired a gun. *Id.* In *Orcutt v. Spokane County*, 58 Wash.2d 846, 364 P.2d 1102 (1961), the Court held that sufficient evidence existed to show an irresistible impulse at the time the decedent committed suicide even though the decedent had attempted to commit suicide multiple times over several months. In contrast to these cases, which have interpreted "irresistible impulse" broadly, the majority of courts have found that if the evidence shows the decedent planned the suicide and knew what he was doing, no irresistible impulse existed even where it is clear that the decedent committed suicide as a result of injuries. *See, e.g., Dry Storage Corp. v. Piscopo*, 249 Ga.App. 898, 550 S.E.2d 419 (2001); *Daniels v. New York, N.H. & H.R. Co.*, 183 Mass. 393, 67 N.E. 424 (1903).

As demonstrated by its varied interpretations, the irresistible impulse test is unclear. The better rule, therefore, is to focus on what Missouri cases actually require in wrongful death cases: whether the decedent's death was "a direct result" of defendant's negligence.

▬▬▬ Before a jury can decide causation, however, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. banc 2001). *See also Eidson*, 863 S.W.2d at 627. If this evidence is not offered or is insufficient, the plaintiff has not made a submissible case. *Alcorn*, 50 S.W.3d at 239. Proximate cause—which is a question for the court—is established by evidence that the injury or death suffered was "the natural and probable consequence of defendant's conduct." *Callahan*, 863 S.W.2d at 865. A plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the decedent's suicide was the "natural and probable consequence" of the injury he suffered at the hands of the defendant. Unless this evidence—which may require expert witness testimony if no direct evidence is available—is presented, the suicide would be an intervening cause

and the claim could not be submitted to the jury. If, however, the plaintiff presents evidence that the suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact whether the suicide is a direct result of the defendant's negligence.

Under the standard cogently explained in *Callahan*, the testimony of Dr. Jarvis, if admissible, meets the proximate cause requirement. The burden, as usual, is still on the plaintiff to prove causation to the jury. The defendant, of course, may offer other evidence, including expert testimony, as to the cause of the decedent's suicide to negate the plaintiff's evidence of causation. If the jury believes that the decedent's act was not caused by the injury, the jury will find that the defendant's negligence did not cause the decedent's death. If, however, the jury believes the decedent's death was the direct result of the defendant's negligence, the jury may hold him liable.

This Court is not making any changes to the causation standard for wrongful death. The Court simply is making it clear that when the decedent commits suicide, the plaintiff must show the suicide was caused by the negligently inflicted injury to make a submissible case. As a result, no modification is necessary to the MAI instructions; these instructions are perfectly adequate to submit the issue of causation. *See* MAI 20.01 and 21.01 (requiring a finding that the decedent died as a direct result of the doctor's negligence in treating the patient for the jury to find for the plaintiff in a wrongful death case).

## The Admissibility of Dr. Jarvis' Expert Testimony

Because Gerald Kivland, now deceased, cannot provide direct evidence as to why he acted as he did, an expert witness may be used to interpret the facts and data relating to his injury and suffering to supply the causal link from the injury to his death. The Kivlands' expert, Dr. Jarvis, testified that (1) Kivland's suicide was the result of the extreme pain caused by the surgery and (2) his suicide was not chosen rationally and, therefore, was not voluntary. If the jury were to believe these opinions, it could find that Kivland's death was the direct result of Dr. Gaines' negligence. The question, therefore, is whether Dr. Jarvis' testimony was admissible.

The admission and exclusion of expert testimony in civil cases in Missouri is governed by section 490.065.[13] *State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003).[14] The statute simply provides that

**13.** Section 490.065 provides:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

**14.** *See also McDonagh*, 123 S.W.3d at 160 (Wolff, J., concurring) ("Section 490.065 is written conveniently in English. It has 204

the circuit court is responsible for determining whether (1) the expert is qualified; (2) the expert's testimony will assist the trier of fact; (3) the expert's testimony is based upon facts or data that are reasonably relied on by experts in the field; and (4) the facts or data on which the expert relies are otherwise reasonably reliable. Section 490.065.

 Appellate courts generally say they review a circuit court's evidentiary rulings for abuse of discretion. *See, e.g., Klotz v. St. Anthony's Medical Center,* 311 S.W.3d 752, 760 (Mo. banc 2010) (citing *Swartz v. Gale Webb Transp. Co.,* 215 S.W.3d 127, 129–30 (Mo. banc 2007)). The expert witness statute sets out the legal basis for admitting expert testimony. An abuse of discretion occurs if the court erroneously finds that the requirements of the expert witness statute are not met. *McDonagh,* 123 S.W.3d 146. If the trial court finds that the expert is qualified "by knowledge, skill, experience, training, or education," that the expert's testimony will assist the trier of fact, and that the facts or data the expert uses are reasonably relied on by experts in the field and otherwise reasonably reliable, the trial court must admit his or her testimony, and if not, it must be excluded. In deciding whether the facts and data on which the expert relies are otherwise reasonably reliable, the circuit court "independently assess[es] their reliability." *McDonagh,* 123 S.W.3d at 156. This is a straightforward application of the statute.[15]

 In deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however, the court is not required to consider the degree to which they are met. So long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert. *Alcorn,* 50 S.W.3d at 246.

The jury will decide whether to accept the expert's analysis of the facts and the data. *Elliott v. State,* 215 S.W.3d 88, 95 (Mo. banc 2007) (" 'Any weakness in the factual underpinnings of the expert's opinion . . . goes to the weight that testimony should be given and not its admissibility.' ") (omission in original) (quoting *Alcorn,* 50 S.W.3d at 246). Similarly, "any concern about the accuracy of the [expert's] instruments [can be] made known to the jury and goes to the weight the evidence should receive." *Murrell v. State,* 215 S.W.3d 96, 111 (Mo. banc 2007).

 As to admissibility, the circuit court is interpreting a statute. Accordingly, this Court reviews the interpretation of the statute *de novo. In re Care and Treatment of Coffman,* 225 S.W.3d 439, 442 (Mo. banc 2007) ("The interpretation of a statute is an issue of law and is therefore reviewed *de novo.*").

### Summary Judgment on the Wrongful Death Claim

 The circuit court found that Dr. Jarvis' opinions—that "(1) Kivland took his life because he was in pain and (2)

words. Those straightforward statutory words are all you really need to know about the admissibility of expert testimony in civil proceedings.").

15. In *McDonagh,* this Court said that "section 490.065.3 expressly requires a showing that the facts and data are of a type reasonably relied on by experts in the field in forming

opinions or inferences upon the subjects of the expert's testimony." *McDonagh,* 123 S.W.3d at 156 (emphasis removed). If the evidence shows that the facts and data relied on meet this standard and the other elements noted above, it is an abuse of discretion for the trial judge not to admit the testimony.

his suicide was not rationally chosen and, therefore, was not voluntary"—were only personal, and not expert, opinions. The circuit court reasoned that Dr. Jarvis "has no psychiatric diagnosis to explain Kivland's behavior on the day he died." The court concluded that "Dr. Jarvis failed to testify that Defendants' alleged negligence caused Kivland to become insane or that Kivland's suicide was a result of an insane impulse."

The court also concluded that "[a]lthough Dr. Jarvis' affidavit and deposition testimony claimed to be within reasonable medical certainty, he admittedly had no basis, factually or scientifically, for his opinions." Instead, the court noted, all of the facts presented in the case showed "Kivland was not insane or operating under any form of depression or psychosis during the time.between Dr. Gaines' surgery and the date of his death." The court concluded by noting that, for Dr. Jarvis to be "qualified as an expert," he needed to rely on facts and data that were reasonably relied on by experts in the field and the facts and data needed to be otherwise reasonably reliable:

> Without a medical diagnosis for Kivland, the statements in Dr. Jarvis's affidavit and deposition testimony become only personal opinions, not scientific conclusions. The admission of such an opinion would be highly prejudicial to the defendants and improper under Missouri law. Admission of the doctor's opinion would be an abuse of discretion.

Applying the standards of section 490.065, this Court concludes that the expert's opinion is admissible. Dr. Jarvis is a board-certified psychiatrist who has experience and training in diagnosing and treating patients similar to Gerald Kivland.

His testimony will assist the trier of fact in deciding whether Kivland's death was the direct result of the injury caused by Dr. Gaines' negligence, if such negligence is established by other evidence. He is qualified, therefore, to testify about the issue of whether Kivland's pain caused him to commit suicide. *See* section 490.065.1.

The circuit court implies that the facts and data are not relied on by other experts in the field or are not otherwise reasonably reliable.[16] The circuit court order focused on the fact that Dr. Jarvis did not have a medical diagnosis for Kivland and that no facts existed that could have indicated to Dr. Jarvis that Kivland was "insane." But, under the clarified standard set out herein, the Kivlands are not required to show that Gerald Kivland had an actual medical diagnosis or that he was actually insane. What is required is that the Kivlands offer evidence that Gerald Kivland's suicide was a direct result of Dr. Gaines' negligence.

Similarly, the circuit court implied that Dr. Jarvis' opinions were not valid in terms of the data on which he relied because he did not have a medical diagnosis for Gerald Kivland. Again, under the clarified standard set out herein, Dr. Jarvis is not required to have a specific medical diagnosis to testify that Gerald Kivland's suicide was the direct result of Dr. Gaines' negligence. It adds nothing to the expert's analysis to opine that Kivland was "insane." Insanity is not a medical term or a diagnostic label; it is a legal term. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS DSM–IV–TR (4th ed.2000).

Dr. Jarvis' treatment of patients similar to Kivland would give him the necessary

---

**16.** The circuit court's order found that "[i]n the present case, the facts show that: (1) Kivland was not insane at any relevant time; (2) he actually understood what he was doing; and (3) he never acted impulsively."

qualification to be able to form an opinion as to the cause of Kivland's suicide.

A medical diagnosis for Gerald Kivland may lead a jury to give an expert's testimony more weight than an opinion that does not name a specific medical or psychiatric diagnosis. Dr. Jarvis himself correctly noted that a jury may not believe him, which shows he understands the kind of factual questions that juries decide. The question of whether Kivland's death by suicide was the direct result of the injury that he suffered is one that is most suitable for a jury: The evidentiary facts surrounding his death are not seriously in dispute—what is in dispute is a question whose answer can be well informed by the life experiences of 12 jurors. It is akin to a question courts commonly assign to juries—that of "reasonable care," which, as Justice Scalia has written, is for the jury when "legal rules have been exhausted and yield no answer." [17]

Dr. Jarvis testified, based on a reasonable degree of medical certainty, that: (1) Gerald Kivland took his life because he was in pain that occurred as a result of his surgery and (2) his suicide was not chosen rationally and, therefore, was not voluntary.[18] The evidence showed that Kivland's paralysis and disability had caused him to change his lifestyle dramatically. Kivland's pain was excruciating. Dr. Jarvis testified that he had reviewed these facts and the other facts in the record to come to his opinions to a reasonable degree of medical certainty.

■ But whether Dr. Jarvis' opinion is to be believed or accepted is for the jury, not the court. It does not matter if the circuit court disagrees with the expert's opinion and believes suicide was the decedent's voluntary decision. This is not a sufficient reason to exclude the testimony. The circuit court is not the trier of fact in this case. That the circuit court does not believe Dr. Jarvis' opinions are credible does not mean the jury could not find them to be credible. "Factual determinations of matters in dispute, including the weighing of medical opinions, rest solely within the province of the jury. It is error for the court to declare as a matter of law a result or legal effect which is within the exclusive province of the jury to determine." *Mitchell v. Kardesch*, 313 S.W.3d 667, 682–83 (Mo. banc 2010) (internal citations omitted).

### Conclusion

To recover on their claim for wrongful death, the Kivlands must show that Gerald Kivland's death by suicide was a direct result of Dr. Gaines' medical negligence. Dr. Jarvis' expert testimony that the suicide was caused by the injury allegedly inflicted by Dr. Gaines allows the Kivlands to proceed with their wrongful death claim. Dr. Jarvis' testimony will assist the trier of fact in determining whether Gerald Kiv-

---

17. Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1176–81 (1989), *quoted in* Colleen P. Murphy, *Integrating the Constitutional Authority of Civil and Criminal Juries*, 61 Geo. Wash. L.Rev. 723, 730 n. 40 (1993).

18. In explaining his opinions, Dr. Jarvis noted that although Kivland was not psychotic, "he felt he had no other choice, in the grand assessment of everything in his life, other than death ... that was an uncontrollable impulse." He further noted that although Kivland had other options available to him, he did not make a rational choice to commit suicide and that "Kivland was of the mind set that death by suicide was his only reasonable option." Dr. Jarvis also noted that although the jury may believe the facts showed that Kivland planned and timed his own death also show he was acting rationally and voluntarily, it was still his expert opinion that the suicide was an "involuntary, irrational decision."

land's death was a direct result of the pain caused by the injury that he allegedly suffered because of Dr. Gaines' negligence; negligence is a fact that the Kivlands must prove through other evidence. Dr. Jarvis' testimony was admissible on the issue of causation, which is a genuine issue of material fact that will be determined by a jury.

The circuit court's judgment on the wrongful death claim is reversed. The judgment on the lost chance of survival is affirmed. The case is remanded.

All concur.