

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| v. | ) | WD84656 |
| | ) | |
| JAMES ADDIE, | ) | |
| Appellant. | ) | FILED: November 29, 2022 |

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
#### THE HONORABLE JON E. BEETEM, JUDGE

### BEFORE DIVISION TWO: LISA WHITE HARDWICK, PRESIDING JUDGE,
### THOMAS N. CHAPMAN AND JANET SUTTON, JUDGES

James Addie appeals his convictions for first-degree murder and armed criminal action. He contends the circuit court abused its discretion by admitting expert testimony regarding tire track impressions that was not "shown to be the product of reliable principles and methods." For reasons explained herein, we affirm.

#### FACTUAL AND PROCEDURAL HISTORY

The sufficiency of the evidence to support Addie's convictions is not at issue. The facts, in the light most favorable to the verdict, establish that in April 2018, Addie shot and killed his paramour, Molly Watson.

Addie and Watson were coworkers at the Department of Corrections at the Moberly Correctional Center.  When their relationship began, Addie told Watson that he was divorced.  In fact, Addie was married and living with his wife and two children.  Addie and Watson got engaged and made plans to marry on April 29, 2018.  On April 25, 2018, Addie and Watson applied for a marriage license.

The week before the wedding, Addie told Watson that his ex-wife died and he needed to help his children with funeral arrangements.  On April 27, 2018, Addie sent a text message to Watson saying his ex-wife's funeral was "tomorrow."  In a subsequent message, Addie expressed that he wanted to see Watson that night.  Later that same day, Addie brought wedding decorations to the hotel and made a payment towards the remaining balance for the wedding.

Addie left his family residence on April 27, 2018, around 7:00 p.m. and returned at 10:00 p.m.  Between 8:00 p.m. and 8:30 p.m., Watson's phone showed Addie exchanged text messages with Watson, with the last message from Watson stating that she "didn't feel like leaving."  Watson's phone showed that Addie called her at 8:26 p.m.  Her phone also showed that she was on that call and that she was also driving for 22 minutes.

On the same night, Glen McSparren was driving on a road where Watson's body would later be found.  McSparren saw an older man driving a dark-colored vehicle and a second vehicle that was stopped near a low-water crossing.  The man stopped and got out of his car to talk to McSparren.  When McSparren asked the man if "someone was stuck down there," the man responded that he did not

2

"know where they were at, it is going to be awhile." McSparren left but returned to the scene later that night, found Watson's body lying in front of the vehicle that was still stopped near the low-water crossing, and notified police.

Upon investigation of the scene, the police found Watson's cell phone and items inside the vehicle pertaining to upcoming wedding plans, including the marriage license listing her name and Addie's. They were able to identify Watson and located additional information about Addie from an online wedding registry. Addie lived approximately 30 minutes from the site where Watson's body was found.

The police arrived at Addie's residence around 2:45 a.m. the next day. Addie told the police he was married, his wife did not know about his affair with Watson, and that he got "involved in something I shouldn't have." Addie consented to a search of his vehicle. One of the officers noticed that the tire tread on Addie's car was consistent with tire tracks at the location where Watson's body was found. Impressions of the tire tracks and photographs of the tire tread were collected for analysis by the Missouri State Highway Patrol Laboratory.

The State charged Addie with first-degree murder and armed criminal action relating to the death of Watson. Defense counsel filed a pretrial motion to exclude the tire track evidence pursuant to Section 490.065,[1] asserting that it was not a proper subject for expert testimony.

---

[1] All statutory references are to the Revised Statutes of Missouri 2016, as updated by the 2020 Cumulative Supplement.

During a pretrial hearing, James Crafton, a criminalist for the Missouri State Highway Patrol Laboratory, testified to his training and expertise in conducting impression examinations of tires and footwear. He further explained that such impression examinations have been tested through scientific methods, peer reviewed, and shown to be reliable with repeatable results. At the conclusion of the hearing, the trial court found that Crafton qualified as an expert and that his opinions were admissible as expert testimony under the standards of Section 490.065.2.

During the jury trial, Crafton opined that the tire marks at the scene where Watson's body was found matched the rear passenger tire on Addie's car. The court overruled defense objections to the testimony on grounds of reliability. Defense counsel cross-examined Crafton but did not present evidence after the State rested.

The jury convicted Addie on both counts. The court sentenced Addie to life in prison without probation or parole for the murder and a consecutive ten-year term for the armed criminal action conviction. Addie appeals.

## STANDARD OF REVIEW

We review the circuit court's decision to admit or exclude expert testimony for an abuse of discretion. *Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 778 (Mo. banc 2015) (citing *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011)). The circuit court has broad discretion to admit or exclude evidence at trial. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006).

4

We will not disturb the court's ruling unless we find that the court abused that discretion. *Id*. An abuse of discretion occurs when the "ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Baker*, 422 S.W.3d 508, 513 (Mo. App. 2014).

### ANALYSIS

In his sole point on appeal, Addie contends the circuit court abused its discretion in admitting Crafton's testimony and overruling defense counsel's objections that the tire impression evidence did not meet the standards of reliability required by Section 490.065.

Section 490.065.2(1) provides that an expert may testify if "the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." (c) and (d). Section 490.065 mirrors FRE 702 and 703, which affirms the circuit court's role as gatekeeper for the admissibility of expert testimony. *State v. Marshall*, 596 S.W.3d 156, 159 (Mo. App. 2020) (citations omitted). This gatekeeping function involves a "three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." *Id*. (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. 2018)).

Addie's argument focuses solely on the reliability of Crafton's testimony and not his qualifications or the relevancy of the evidence. The reliability of expert testimony is interpreted under *Daubert v. Merrell Dow Pharm., Inc.*, 509

5

U.S. 579, 593–94 (1993). [1] *Id.* Courts consider factors such as testing, peer review, error rates, and "acceptability" in the scientific community in determining reliability of a scientific theory or technique. *Id.* at 160 (citing *Daubert*, 509 U.S. at 593-94). Addie argues that the State failed to cite a specific case on tire impressions under *Daubert* or Section 490.065. However, the test for reliability is "flexible," and the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*.

The record indicates that the State presented evidence to address several factors relating to the reliability of Crafton's expert opinions. Crafton testified that he was trained to collect impression evidence, such as "when a tire or a foot would make contact with a surface and has left a re-producible impression on that particular surface." He explained that "impression examination" is a process that has been tested through scientific methods, resulting in a well-established set of standards for determining the class and individual characteristics of such tracks. Crafton referred to peer review journals and articles where the examination process has been shown to produce reliable and repeatable results. He explained that the testing process for impressions has a low error rate and that matches can be determined within a positive predictive rate of 98.8%.

---

[1] Our court "has held that because the language of Section 490.065 now mirrors FRE 702 and 703, and because FRE 702 and 703 are interpreted under *Daubert* and its progeny, the cases interpreting those federal rules remain relevant and useful in guiding our interpretation of Section 490.065." *State v. Marshall*, 596 S.W.3d 156, 159 (Mo. App. 2020) (referencing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993).

Based on this testing process, Crafton testified to his conclusion that the rear tire tread on Addie's car matched the tire tracks at the location where Watson's body was found. He also stated that the results obtained in the highway patrol laboratory were peer reviewed by another qualified expert.

Addie argues on appeal that Crafton relied on a research study involving footwear impressions and that there are no similar studies for tire tracks. However, Crafton specifically addressed whether tire track impressions have been the subject of scientific study:

> Q: …The process of evaluating tire casts compared to tires and going through the process you just described, individual characteristics, is that process relied upon by experts in your field?
>
> A: Yes, it is.
>
> Q: Has that process been peer reviewed?
>
> A: Yes.
>
> Q: Has it been scientifically studied?
>
> A: Yes, it has.
>
> Q: And validated?
>
> A: Yes.
>
> Q: Do you find it otherwise reasonable reliable?
>
> A: Yes, I do.
>
> Q: Did you rely on it in this case?
>
> A: Yes.

When further questioned on this topic, Crafton noted that he had provided Addie's counsel with "quite a few different articles specifically geared towards tire impressions." He confirmed that the articles involved peer-reviewed studies that show the "scientific reliability of tire impressions of tire impressions or impression evidence." Addie's counsel declined to cross-examine Crafton about the referenced articles.

The record supports the circuit court's determination that Crafton's testimony satisfied the requirements of reliability under Daubert and Section 490.065 for an expert opinion regarding tire track impressions. Accordingly, we find no abuse of discretion in the admission of the expert evidence and deny the point on appeal.

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

8